THOMAS A. RIDER, AS ADMINISTRATOR *AD PROSEQUEN-DUM* OF SAYOKO RIDER, THOMAS RIDER, HELEN RIDER, BY THEIR GUARDIAN *AD LITEM*, THOMAS A. RIDER, AND THOMAS A. RIDER, INDIVIDUALLY, PLAINTIFFS, v. VERNON LYNCH AND GERALD DAY, DEFENDANTS AND THIRD-PARTY PLAINTIFFS-APPELLANTS, v. GENERAL INSURANCE COMPANY OF AMERICA, AND MARVIN H. GUENTHER, Jr. D/B/A GUENTHER AGENCY, THIRD-PARTY DEFENDANTS-RESPONDENTS.

Argued March 3, 1964—Decided June 22, 1964.

466

*Mr. Martin L. Haines* argued the cause for defendants and third-party plaintiffs-appellants (*Messrs. Dimon, Haines & Bunting,* attorneys).

*Mr. Michael Patrick King* argued the cause for third-party defendant-respondent General Insurance Company (*Mr. Carl Kisselman,* of counsel; *Messrs. Kisselman, Devine, Deighan & Montano,* attorneys).

*Mr. Robert W. Criscuolo* argued the cause for third-party defendant-respondent Marvin H. Guenther (*Messrs. Parker, McCay & Criscuolo,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Vernon Lynch was involved in a collision while operating an automobile owned by Gerald Day. The driver and two passengers in the other car were injured and one passenger was killed. Damage suits were brought against Lynch who, believing that he was entitled to coverage under a policy of liability insurance issued by the General Insurance Company, called upon the company to defend the action and to pay any judgment recovered therein up to the monetary limits of the policy. The insurer denied Lynch was covered under its policy and refused to defend. Lynch thereupon filed a third-party action in the damage suit against General Insurance Company and Marvin H. Guenther, Jr., doing business as Guenther Agency, the broker who procured the policy in question, seeking a recovery against them for any judgment that might be returned against him in the principal case. The action against Guenther was predicated upon a claim that if the General policy did not protect Lynch, he was negligent in procuring and delivering such a deficient policy. As to General Insurance Company, Lynch also charged negligence in failing to issue a proper policy and sought reformation of its terms so as to provide the agreed coverage. And he demanded that General be required to pay any judgment against him in the damage suit. Reading the complaint, it is difficult to find a claim that the policy as written extended coverage to Vernon Lynch. That issue, however, seems to have been within the broad language of the pretrial conference order and since it was argued at the trial level and in the

appellate tribunals, we consider it to be within the compass of the case before us.

The third-party complaint was severed and the issues of coverage as well as Guenther's individual liability were tried first without a jury. At the conclusion of plaintiff's case, the trial court granted the motion of General and Guenther for dismissal. Appeal was taken to the Appellate Division where the adverse judgment was affirmed. We granted Lynch's application for certification. 41 *N. J.* 126 (1963).

## I.

The factual background of this litigation is unusual. Gerald Day was the owner of a 1956 Ford automobile. Day was an airman in the United States Air Force and stationed at Fort Dix, New Jersey. In order to keep a car at Fort Dix, it was necessary to obtain a registration sticker which was issued by the military authorities. Such a sticker could not be obtained unless the car was covered by automobile liability insurance. Prior to July 1960, Day had obtained the sticker for his Ford. He had qualified for it by obtaining the necessary insurance policy from Marvin H. Guenther, Jr., doing business as Guenther Agency in Mount Holly, New Jersey.

Airman Day was engaged to Tomiko Lynch, an 18-year-old Japanese girl, the adopted daughter of Vernon Lynch. Lynch, also a member of the armed forces and stationed at Fort Dix, had married Tomiko's mother some years earlier when he was on duty in Japan. Tomiko came to the United States with her father and mother in August 1955 at which time she spoke practically no English. In this country she attended school through the tenth grade.

Day was a frequent visitor at the Lynch home at Fort Dix. Lynch said he regarded him almost as one of the family. They worked together on repairing and installing a new motor in a car owned by Lynch, and in connection with that work and for other reasons, Lynch occasionally rode with Day in the Ford car. They kept the tools for the repair work in Day's car. Lynch's car was junked before this accident.

In July 1960 Day was transferred to Alaska. He decided to leave his car with Tomiko for her use and "to help the family out, too." A reasonable inference from the testimony is that he was aware her father would use it at times also. Tomiko had no driver's license but she obtained a learner's permit and when Day left for Alaska on July 27, she drove him to the New York bus station in the Ford. Her father, a licensed driver (see *N. J. S. A.* 39:3-13), accompanied them and after Day departed, she drove back to Fort Dix. Thereafter, Tomiko used the car regularly. Her father drove it also on occasions. When he wished to do so, he obtained the keys from her.

██ Apparently the insurance policy on Day's car had expired. Although the testimony is not very clear, it fairly indicates that the required military base sticker showing insurance coverage had to be renewed annually or at certain intervals. Tomiko and Vernon Lynch drove to the office of defendant Marvin H. Guenther, Jr. to arrange for insurance on the car. She was still operating under a learner's permit at the time. Tomiko explained the circumstances to him and told him she wanted insurance. Despite the fact that this young woman was foreign-born, a relatively recent resident of our country, with limited education here and obviously not at ease on the witness stand, her attorney was held very strictly to non-leading questions in examining her. For example, she was asked:

"Q. Did you explain how you happened to have the car?
Mr. Kisselman: I object to it as leading.
The Court: All right. Objection sustained."

A short while later, after saying she had told Guenther the circumstances, substantially the same question was asked and the objection that it was leading was overruled. Then:

"Q. Do you recall what was said about how you happened to get the car?
Mr. Kisselman: I object to it. It is suggesting the answer.
The Court: I am afraid it is, Mr. Bunting. I shall sustain the objection."

These and other similar limitations impel us to suggest that such questions are not offensively leading. At most they call attention to a topic or subject about which testimony is desired. See, *e. g., State v. Abbott*, 36 *N. J.* 63, 78–79 (1961) ; *People v. Hodge*, 141 *Mich.* 312, 104 *N. W.* 599 (*Sup. Ct.* 1905) ; 3 *Wigmore, Evidence*, § 769, *p.* 122 (1940).

In any event it is obvious from Tomiko's testimony that she made Guenther aware of her situation with respect to the car and its use, and that she wanted insurance coverage that would provide protection in her particular situation. He was informed also that she had no driver's license, and so he was on notice that her father (who came with her but did not participate in the conversation) and probably other persons would accompany her when she drove the car. The application for insurance which he filled out, had Tomiko sign and swear to, and then submitted to obtain a policy, specifically noted that she had no driver's license. It is reasonable to assume that a broker engaged in writing automobile liability insurance would know or should know that a licensed driver accompanying her while she was driving would expose himself to possible liability for accidents. See *Forker v. Pomponio*, 60 *N. J. Super.* 278 (*App. Div.* 1960) ; *N. J. S. A.* 39 :3–13.

According to Tomiko, Guenther said she could not have insurance on the car because she did not own it, and that the best he could give her was nonowner's insurance. Apparently he did not offer any explanation as to the scope of coverage of such a policy, or how it would protect her. He did tell her, however, that he would try to obtain insurance "so she could drive safely." He knew she was 18 years of age at the time, a high school student and living at home with her adoptive father, Vernon Lynch, and her mother. On the basis of that information, Guenther reasonably might be expected to realize or to assume that Vernon Lynch would probably pay for the gasoline and oil for the car and for its upkeep. Similarly, he might be expected to realize or to assume that Tomiko would do errands for her parents in the car and that at least her

father would probably use it on occasion. Although the testimony of this young lady is not as clear as it might be, at the close of the plaintiff's case it would seem to be susceptible of the inference that she indicated to Guenther she wanted a policy which would protect her and her family while the Day car was being used. Therefore, when he told her that he would endeavor to obtain insurance so she could drive "safely," presumably he had in mind that the standard form of automobile liability insurance policy contains an omnibus clause which would extend its protection to any member of her family accompanying her or operating the car with permission of the owner, or responsible for the use of the car. See *Matits v. Nationwide Mut. Ins. Co.,* 33 *N. J.* 488, 490 (1960); Putnam, "The Standard Automobile Policy: What Persons and Which Vehicles are Covered," 11 *Ark. L. Rev.* 20 (1956-1957); Ashlock, "Automobile Liability Insurance: The Omnibus Clause," 46 *Iowa L. Rev.* 84, 102–118 (1960).

Guenther had Tomiko sign an application to the "Automobile Assigned Risk Plan" for liability insurance. It is obvious from the copy of the Plan in the appendix that issuance of standard type automobile policies is contemplated, such as would contain an omnibus clause. And, as will appear hereafter, the policy issued here did in fact contain that clause.

The application not only contained a number of questions which Guenther certified had been put to her, but it recited also that he had read the Assigned Risk Plan for this State, had "explained its provisions" to her, and had included in the application "all required information given to me by the applicant." On the face of the application, Guenther wrote "non-owned cover desired." No explanation of that type coverage is set forth either in the application or in the Plan, and the record is barren of any indication that Guenther advised Tomiko or her father of the nature of such coverage. In fact, the inference is to the contrary because obviously if they had been told the non-ownership coverage would be of the type actually furnished, it would have been rejected as worthless to them.

The questions on the application which Guenther certified he asked Tomiko would give the impression that if a policy were issued, its coverage would not be limited to the named insured. Most of the questions sought information relating to the driving record of the applicant and "anyone who usually drives the applicant's motor vehicle."

The application appears to have been sworn to on August 16, 1960. On completion, Vernon Lynch handed Guenther a check for the required premium deposit. In return, he or his daughter was given a receipt indicating part payment for an "auto liability" policy. The balance due on the premium was paid by money order to Guenther dated August 17. Some time thereafter the policy was delivered. It turned out to be a policy issued under the Assigned Risk Plan by the General Insurance Company, a company for which Guenther was not a designated agent. The named insured was Tomiko Lynch, her occupation was stated as student, Pemberton High School. The front cover of the policy says in large type:

"FAMILY AUTOMOBILE POLICY"

and toward the bottom of the cover appears:

"

Provides You with Complete Insurance Protection"

Tomiko did not read the policy. She "could not read English very well." Since Guenther had told her he would try to obtain insurance which would enable her to drive "safely," undoubtedly she inferred from the cover on the policy he had procured such coverage for her, and if he had not been successful in doing so, he would have advised her. Vernon Lynch did not examine the policy. His daughter told him she had received it. That was the extent of his knowledge about it.

Under the policy (a standard type automobile liability contract), General Insurance Company agreed to pay on

behalf of the insured all sums the insured would become legally obliged to pay as damages because of bodily injury sustained by any person "arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile." In connection with operation of a non-owned car, the insured was defined to be the named insured, any relative, residing in the same household, provided the actual use of the car is with the permission of the owner, and any other person legally responsible for the use of a non-owned automobile, if such automobile is not owned or hired by such person, provided the actual use thereof is by the named insured or any relative residing in the same household, whose actual use is with the permission of the owner. "Non-owned automobile" means *"an automobile * * * not owned or furnished for the regular use of either the named insured or any relative."* (Emphasis added)

In the place on the policy for the listing of any specifically covered automobile, the only notation is "non owned auto coverage."

■■ On December 31, 1960, the date of the accident out of which the damage suit arose, Vernon Lynch was operating the car for family purposes. The operation obviously was with permission of Tomiko Lynch, and the proof adduced at the trial supports an inference also that his operation was with Day's general permission. It is likewise clear, however, that the automobile had been furnished by Day for the regular use of his fiancee, Tomiko Lynch, during his assignment in Alaska. Therefore, the car did not qualify for coverage as a non-owned vehicle, and neither it nor Vernon Lynch was within the policy protection at the time of the accident. But more than this, the policy provided no protection for Tomiko Lynch either on that day or at any other time since its inception. It was completely worthless to her and her father in connection with their use of Day's car— the only purpose for which it was sought from Guenther and paid for. The purpose of non-ownership coverage of the kind included in General's policy is to provide protection for an

insured for the occasional or infrequent driving of an automobile other than his own, but not to take the place of insurance on automobiles which are furnished for his regular use. *Rodenkirk for Use of Deitenbach v. State Farm Mut. Auto Ins. Co.,* 325 *Ill. App.* 421, 60 *N. E.* 2*d* 269 (*App. Ct.* 1945); *Farm Bureau Mut. Automobile Ins. Co. v. Marr,* 128 *F. Supp.* 67 (*D. C. N. J.* 1955); *Leteff v. Maryland Cas. Co.,* 91 *So.* 2*d* 123 (*La. Ct. App.* 1957); Annotation, 83 *A. L. R.* 2*d* 926 (1962).

██ For the reason stated, General Insurance Company cannot be held liable on its policy. Furthermore, in the facts adduced at the trial we see no evidence of negligence on its part in connection with the issuance of the policy. Guenther was not its agent. He was a broker and acted as agent for the Lynches. *Schustrin v. Globe Indem. Co.,* 44 *N. J. Super.* 462 (*App. Div.* 1957); *John Roach, Inc. v. Pingpank,* 39 *N. J. Super.* 336 (*App. Div.* 1956). There was nothing in the application for the insurance on which General acted which would warrant an inference that it was negligent in issuing the policy in question in response thereto. Under the circumstances, the trial court was correct in sustaining the denial of coverage and in refusing reformation.

## II.

We come now to consideration of the claim of Vernon Lynch against defendant Guenther. It poses five questions: (1) Was the proof adduced by Lynch as to negligence on the part of Guenther in procuring the issuance of the policy delivered to Tomiko Lynch sufficient at the close of plaintiff's case to require denial of the motion to dismiss and to put Guenther to his defense; (2) Were the facts and circumstances of the conversation between Tomiko Lynch and Guenther sufficient to warrant an inference at the close of plaintiff's case that she wished and he understood and undertook to provide insurance coverage for the Day car which would protect her and her father Vernon Lynch when she was driving and he was with

her, or he was driving and she a passenger, or when he was driving alone with her permission; (3) Was he negligent under the circumstances in advising her to apply for, and in obtaining nonowner coverage for her when he knew or should have known that such coverage would not furnish the only protection she required, *i. e.*, against liability for accidents arising out of the use of the Day car; (4) Having been informed of the circumstances under which Tomiko Lynch had the Day car in her possession and the nature of its use while in her possession, and her desire for insurance protection which would safeguard that use, was he negligent in furnishing a policy which gave no coverage to her or her father; and (5) Having advised Tomiko Lynch that he would try to obtain insurance which would enable her to drive "safely," was he negligent in failing to inform her that the policy transmitted to her provided no protection for herself or any member of her family while driving or using Day's car; or in failing to inform her that under the circumstances she had disclosed to him, he could not procure insurance which would provide the protection she desired.

One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby. *Barton v. Marlow,* 47 *N. J. Super.* 255, 259 (*App. Div.* 1957); *Marano v. Sabbio,* 26 *N. J. Super.* 201, 205–206 (*App. Div.* 1953); *Milliken v. Woodward,* 64 *N. J. L.* 444, 448 (*Sup. Ct.* 1900); 3 *Couch, Insurance* (*2d ed.* 1960), §§ 25:32, 25:36,

25:37, *pp.* 329, 335, 336; 16 *Appleman, Insurance Law and Practice,* §§ 8841, 8843, *pp.* 300, 306 (1944).

 Thus, an insurance broker, in dealing with his clients, ordinarily invites them to rely upon his expertise in procuring insurance that best suits their requirements. It is not necessary for the client in order to establish a breach of duty to prove that he laid out for the broker the elements of a contract of insurance. It is sufficient to show that he authorized procurement of the insurance needed to cover the risks indicated and that the broker agreed to do so but failed or neglected to perform his duty. The terms of the contract to procure the insurance, the scope of the risk and subject matter to be covered, may be found by implication. The principal does not sue on a contract of insurance; he seeks recovery for the loss occasioned by the failure to procure such a contract or such a valid contract. *Hamacher v. Tumy,* 222 *Or.* 341, 352 *P. 2d* 493 (*Sup. Ct.* 1960). Moreover, if the broker agrees to obtain or to try to obtain the coverage he knows or should know the principal seeks, and he finds that he cannot procure it, he is bound to notify his principal of that fact with reasonable dispatch. *Barton v. Marlow, supra* (47 *N. J. Super.,* at *p.* 259); *Marano v. Sabbio, supra* (26 *N. J. Super.,* at *p.* 206); *Couch, supra,* § 25:47, *p.* 353; *Appleman, supra,* at *p.* 303. Or, if it turns out to be impracticable to follow the instructions or request of his principal, a like duty of seasonable notice exists. *Couch, supra,* § 25:34.

Although we have not been referred to a case precisely in point with the situation before us, there are cases in our State which suggest the course to be followed. In *Milliken v. Woodward, supra,* Milliken and his wife engaged defendant brokers to effect fire insurance on a certain steam tug in which they owned a seven-eighths interest. They informed the brokers of the nature of their ownership and that they wished their interest specified and protected. The brokers agreed to procure such coverage and the Millikens paid them the premium demanded. Subsequently, two policies were issued

insuring the tug in the name of G. N. Milliken and making "the loss, if any, payable to Blanche Milliken as her interest may appear." The policies contained a condition stating, "this entire policy, unless otherwise provided, by agreement endorsed thereon, or added thereto, shall be void * * * if the interest of the insured be other than unconditional and sole ownership." The tug was destroyed by fire and the insurers refused to pay because of breach of the ownership condition. The Millikens then sued the brokers to recover the loss alleging their negligence in procuring the insurance. The Supreme Court held that the facts gave rise to a cause of action against the defendants for failure to exercise the proper care and skill in arranging for the issuance of the policies.

In *Barton v. Marlow, supra,* plaintiff had purchased a used Chevrolet from a Pontiac automobile dealer in May 1949. Defendant Marlow was general manager of the dealer and handled the transaction. He was an insurance broker also and sold insurance as a sideline. Plaintiff purchased liability insurance from him effective July 12, 1949 and Marlow arranged renewals of the policy for the years 1950 and 1951. Payment of premiums was on a credit basis. Each year plaintiff would ask for renewal and Marlow would assure him it was taken care of. In February 1952 the Chevrolet was traded in for a Pontiac. In May or June 1952 plaintiff spoke to Marlow about the July 1952 renewal and Marlow told him not to worry, "I have got you covered." On August 14, 1952, plaintiff had an accident and on reporting it to the insurer, was told his policy had been cancelled. He took the matter up with defendant who said, "I told them not to cancel that policy." Subsequently, a money judgment was entered against Barton on account of the accident and he sued Marlow charging him with negligence because of his failure to keep the policy in force. The trial court dismissed for lack of proof of negligence and for plaintiff's contributory negligence. The Appellate Division reversed saying a jury question existed on both issues because the proof warranted "a finding that defendant undertook *at some time* to see to it that plaintiff

would be insured in August 1952, or otherwise, impliedly, to advise him to the contrary in time to enable him to obtain protection elsewhere."

Among other things, the Appellate Division said:

"It is, moreover, the rule that where one undertakes to effect insurance he impliedly undertakes to give notice to the applicant in the event of his failure or inability to procure it. * * * There were intimations in the course of plaintiff's case that the 1951–1952 policy had been cancelled by the company prior to its expiration, although it is not clear for what reason. The jury could have concluded that if there was a prior cancellation of the policy, exercise of reasonable attention to the matter on defendant's part would have apprised him of that fact, and that if he could not then get the policy reinstated, due diligence would have led him to notify the plaintiff in time to enable the latter to obtain insurance elsewhere prior to the accident. A similar finding could have been made if the difficulty was an inability by defendant to effect a renewal of the policy at its expiration." 47 N. J. Super., at p. 259.

In *Marano v. Sabbio, supra,* plaintiff purchased a business and thereafter her husband, acting for her, submitted various insurance policies, which the previous owner had held, to the defendant, an insurance broker. The husband told the defendant his wife wanted the same types of insurance, particularly burglary insurance. Later, when certain of the policies were received and the premiums paid thereon, plaintiff's husband inquired about the burglary policy and was told by defendant not to worry about it, there was a binder on it. About two months later, when a burglary loss occurred, it developed that no such policy or binder had been written. Plaintiff sued defendant for breach of the undertaking to procure the insurance. The defense was that at the first conference about insurance, Sabbio told plaintiff's husband that he could obtain all the other type policies desired but the "burglary policy will be tough." Sabbio testified also that he had made three unsuccessful applications for the burglary coverage, and that he had never charged nor had he been paid a premium for such a policy.

The Appellate Division affirmed a judgment for the plaintiff holding the proof supported the conclusion that the

broker had undertaken to effect insurance and therefore he impliedly obliged himself to give notice to the plaintiff in the event he failed to procure the coverage. It was said that the broker in such case is liable in tort or for breach of contract on the theory that he owes a duty to his principal to exercise reasonable skill, care and diligence in effecting the insurance; that the promise to take the policy is sufficient consideration, and if the broker neglects to procure the coverage, or otherwise fails to act with proper skill and care, he becomes liable in damages not exceeding the amount of insurance he was employed to effect.

We agree that the proof offered by Lynch was somewhat sketchy, but we think the circumstances were such at the close of his case as to permit certain inferences of negligence to be drawn against defendant Guenther.

A fair impression to be gained from the facts which we have outlined above, is that Tomiko Lynch wanted an insurance policy which would provide the necessary coverage and protection. We believe the facts are susceptible of the inference that a broker possessing reasonable skill, judgment and experience would realize the protection necessary meant coverage for Tomiko Lynch, for anyone (particularly her father) who accompanied her to make it possible for her to drive legally, for anyone who drove for her, and for members of her family who used the car with her permission.

Obviously, Tomiko knew nothing about the technical aspects of insurance policies. She engaged Guenther, placed her faith in him and relied on him to obtain the protection which the circumstances impliedly demanded. When he told her he could give her nonowner insurance, without explaining the scope of such coverage, and that he would try to obtain insurance so she could drive "safely," she was entitled to assume he had undertaken to furnish the needed policy. Moreover, she was justified in assuming that if he could not procure such a policy, he would advise her with reasonable dispatch so she could look elsewhere.

When the General Insurance Company policy was delivered, its title page, "Family Automobile Policy," would suggest coverage for Tomiko and her father. It extends its protection to "any relative of" Tomiko, "provided the actual use [of the automobile] is with the permission of the owner." Thus, since Guenther applied for the policy through the Assigned Risk Plan with which he was familiar, and the policy on delivery contained the ordinary omnibus clause, it may be inferred he intended to fulfill his undertaking to obtain coverage not only for Tomiko, but for her father, Vernon Lynch, as well.

There is no doubt that when Day departed for Alaska, he left the car primarily for Tomiko's use. In our view, however, the circumstances in their totality create a factual issue whether Vernon Lynch likewise received permission from Day for occasional use. This being so, by virtue of the omnibus clause, Vernon would be entitled to the insurance protection while driving unless for some other reason coverage was excluded. There was such a reason, *i. e.*, the policy by specific language supplied no coverage for a non-owned car which was furnished for the regular use of the named insured or any relative. The language denuded the policy of the basic coverage Guenther was commissioned to procure. In no sense did the insurance meet the need of Tomiko Lynch and her father with respect to the use of Day's car.

If Guenther was familiar with the Assigned Risk Plan as he certified, he knew or should have known on the facts presented to him that the policy he had Tomiko apply for would not serve her purpose. Moreover, as a person holding himself out to the public as a broker, he was charged with knowledge of the nature and scope of non-ownership automobile coverage, and he should have known it would not fit his client's need. If he was not aware of the limited coverage presented by such a policy, since he knew that Tomiko was relying on him, he was under a duty to examine and reject it before delivery to her. And, if there is no type of non-owner coverage available to satisfy the commission he under-

took, he should have ascertained the fact and given notice to his principal. As we have said, the proof present at the close of the plaintiff's case, unexplained and uncontradicted, supported an inference that Guenther undertook to obtain insurance coverage for Tomiko which would protect her and her father, Vernon Lynch. Accordingly, on the proof when the motion was made, it could be inferred that Lynch occupied at least a third-party beneficiary status with respect to the arrangement between his daughter and Guenther, a status sufficiently proximate to their dealings that a broker exercising due care would have understood he was committing himself to obtain coverage for the daughter which would cover the father when he was using the car. It follows from such conclusions that a factual issue existed also as to whether Guenther acted with the degree of reasonable skill and judgment required of an insurance broker when he procured the inadequate policy delivered to plaintiff's daughter. *Cf. Hamacher v. Tumy, supra; Derby v. Blankenship,* 217 *Ark.* 272, 230 *S. W. 2d* 481 *(Sup. Ct.* 1950).

In passing, it should be said that failure of Tomiko or the plaintiff to read the policy will not estop either of them from prosecuting a cause of action in negligence against Guenther. Nor will such failure support a defense of contributory negligence. In view of the relationship of principal and agent between Tomiko and Guenther, she and her father were entitled to rely upon and believe that the broker had fulfilled his undertaking to provide the coverage impliedly agreed upon, and that the policy sent to them represented accomplishment of that undertaking. *Hampton Roads Carriers v. Boston Ins. Co.,* 150 *F. Supp.* 338, 343 *(D. C. Md.* 1957); *Harris v. A. P. Nichols Inv. Co.,* 25 *S. W. 2d* 484 *(Mo. App.* 1930); *Israelson v. Williams,* 166 *App. Div.* 25, 151 *N. Y. Supp.* 679 *(App. Div.* 1915), leave to appeal denied 167 *App. Div.* 938, 152 *N. Y. Supp.* 1119 *(App. Div.* 1915), appeal dismissed 215 *N. Y.* 684, 109 *N. E.* 1079 *(Ct. App.* 1915); *Couch, supra,* § 25:60, *p.* 370.

For the reasons expressed, we conclude that plaintiff's evidence was enough to warrant denial of the motion to dismiss as to defendant Guenther and to require him to proceed with his defense. Accordingly, the judgment of the Appellate Division affirming the trial court's grant of the motion is reversed and the case is remanded for a new trial as to Guenther.

We assume from the record that the personal injury and death action against Vernon Lynch has not yet been tried. Therefore, if liability on the part of Guenther is found on the retrial, determination of the amount of damages to be assessed will have to await the outcome of that action.

The judgment of the Appellate Division in favor of defendant General Insurance Company is affirmed.

HANEMAN, J. (dissenting). I agree with the majority insofar as General Accident Insurance Company is concerned, and would affirm the Appellate Division. However, as regards Guenther, I would as well affirm.

The basic theory upon which Vernon Lynch sought to hold Guenther liable is unclearly and nebulously articulated in the third-party complaint and the pretrial order. However, the trial court, Appellate Division and counsel apparently conceived that the issue involving Guenther was that stated in the brief of Lynch, filed in this court, "Is Martin Guenther personally liable for his failure to obtain requested insurance coverage, or alternatively, for his failure to warn the applicant that she was not insured?" The primary issue, restated, is comparatively simple, i. e., "Did Tomiko Lynch (now Jones) apply for automobile liability insurance which would have extended coverage to her father, did she obtain such a policy, did Guenther advise her that such insurance was not available to her, and was such insurance available to her?"

On motion for judgment at the end of the plaintiff's case we must accept the evidence submitted on his behalf as true and accord him the benefit of all legitimate inferences that may be drawn therefrom. I proceed to so assay the testimony. Tomiko Jones was the sole witness as to the circumstances

surrounding her application for insurance. As noted in the majority opinion, her testimony was "not as clear as it might be." However, what here follows may be fairly inferred. She testified that she desired public liability insurance which would cover her and anyone operating the car with her permission. She expressed this in a homely fashion by stating that she wanted insurance on "this 1956 Ford." Guenther advised her that she could obtain only a nonowner policy restricted to insuring her operation of the car, so that, as she stated, "I could drive safely." She consented to accept a policy so limited for which she eventually paid a premium of $13.44.

As the evidence stands, then, it is inferable that Mrs. Jones requested a policy which would cover her father's operation of the car, but because of Guenther's advice that no such policy was available to her she consented to accept a policy under which only she was insured. For plaintiff to succeed in holding Guenther liable on the above thesis, he should have additionally proved that Guenther's advice was erroneous, *i. e.*, a policy of the nature requested was actually available. Otherwise stated, that Guenther was negligent in not obtaining the type of policy which he knew she sought from him and which was actually available to her. The record is void of any such proof. Hence, there was lacking an essential element in plaintiff's case, for absent such proof there was no demonstration that Guenther's advice was faulty and that his conduct was negligent.

The proof is clear that Guenther advised Tomiko Jones of the type policy she was receiving. The alternative cause of action was therefore as well not sustained.

HALL, J., concurring in result.

*For reversal in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—Justice HANEMAN—1.