**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2182-15T4

C.S. OSBORNE & CO., INC.,

    Plaintiff-Appellant,

v.

THE CHARTER OAK FIRE INSURANCE
CO., and THE TRAVELERS COMPANIES
INC.,

    Defendants,

and

BOLLINGER, INC., n/k/a ARTHUR
J. GALLAGHER & CO.,

    Defendant-Respondent.

_____

        Submitted February 2, 2017 — Decided May 1, 2017

        Before Judges Lihotz, Hoffman and O'Connor.

        On appeal from Superior Court of New Jersey,
        Law Division, Hudson County, Docket No. L-
        0211-14.

        Paray Law Group, LLC, attorneys for appellant
        (Paul E. Paray, on the briefs).

        White and Williams, LLP, attorneys for
        respondent (Christopher P. Leise, Marc L.
        Penchansky, and Alicia M. Van Sciver, of
        counsel and on the brief).

PER CURIAM

Plaintiff C.S. Osborne & Co., Inc. appeals from a December 8, 2015 order granting summary judgment to defendant Bollinger, Inc. (Bollinger), and dismissing plaintiff's claims against Bollinger with prejudice.[1] Bollinger served as plaintiff's insurance broker from 2001 until 2012, when Superstorm Sandy flooded and damaged plaintiff's commercial facilities in Harrison. Plaintiff filed a complaint alleging professional negligence and related claims against Bollinger[2] because its flood insurance policy provided only $1,000,000 of coverage, well below the amount of damage to plaintiff's facilities. Plaintiff alleged Bollinger had a duty to provide quotes for higher policy limits. Judge Francis B. Schultz disagreed and granted summary judgment to Bollinger, and denied plaintiff's cross-motion for partial summary judgment.

---

[1] Plaintiff also appeals from a separate December 8, 2015 order denying its cross-motion for partial summary judgment, as well as an order denying reconsideration. Plaintiff further claims the court erred in failing to order a change of venue.

[2] Plaintiff also sued its insurance carrier, The Charter Oak Fire Insurance Company, and its underwriting issuing company, The Travelers Companies, Inc. (collectively, Travelers). After the entry of the orders dismissing Bollinger from the case, plaintiff proceeded to trial against Travelers, reaching a settlement prior to verdict.

Plaintiff repeats the same argument on appeal. After reviewing the record and applicable law, we conclude Judge Schultz correctly concluded Bollinger had no duty to provide quotes for higher policy limits. We therefore affirm.

I.

We recite the facts found in the summary judgment record viewed in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Plaintiff, a family business in operation since 1826, manufactures tools used for leatherwork, upholstery, and other purposes. Plaintiff has its headquarters, along with manufacturing facilities, in Harrison; it also has manufacturing facilities in St. Louis, Missouri.

After meeting with Bollinger, plaintiff purchased an insurance policy from Travelers covering three commercial buildings in Harrison, along with its Missouri property. The policy was in effect from sometime in 2004 through the date of Superstorm Sandy. The policy excluded water loss but included "Broad Form Flood" coverage of $1,000,000 for flood damage. Bollinger's March 2012 insurance renewal proposal[3] stated, "Higher limits or sub-limits may be available so please advise us if you

---

[3] The proposal listed a total replacement cost of $11,746,950 for plaintiff's buildings and contents at its Harrison location.

are interested in higher limits options so that we may secure quotations for your consideration." On October 29, 2012, Superstorm Sandy flooded and damaged plaintiff's three buildings.

In March 2012, plaintiff provided Bollinger with an appraisal dated January 14, 2011, which stated, "The subject property is situated within flood hazard zone 'X' as depicted on Community Panel #340221 0081 D, dated August 16, 2006[,] and published by the Federal Emergency Management Agency (FEMA)." The appraisal stated, "[T]he effect of the flood plain on the value of the subject property is considered limited." The appraisal valued the property at $1,600,000.

Steve Marshall, a Bollinger insurance broker with thirty years of experience, handled plaintiff's account since 2001. Marshall and his team worked with plaintiff to assist with any insurance or risk management issues. Marshall testified he managed client relationships, made sure clients were happy, made sure "things [were] done proper[ly]," and replaced canceled policies with more suitable policies to meet his clients' needs. In his deposition, Marshall stated he toured plaintiff's Harrison facilities in 2001 and 2004.

Beginning in 2004, Marshall and plaintiff's president saw each other at monthly board meetings of a local cemetery. Marshall testified that unlike most clients, plaintiff's president had

access to him on almost a monthly basis to discuss any follow-up issues regarding insurance renewals. Plaintiff's expert witness opined that because elevations were low with a river nearby, a discussion about flooding should have occurred.

On March 20, 2003, Bollinger wrote plaintiff suggesting it purchase terrorism coverage, which plaintiff purchased. On June 2, 2004, after meeting plaintiff's president, Marshall advised plaintiff to explore coverage for Employment Practices Liability Insurance (EPLI). The message also stated, "If the cost [outweighs] the benefit then [plaintiff] can always decline to purchase the coverage." On March 24, 2005, while advising plaintiff of revised premiums, Marshall detailed a "Package policy," which included earthquake coverage, and recommended the higher deductible.

On June 28, 2006, Kelly Lamb, an account executive with Bollinger, provided plaintiff's president with a products recall coverage application for review after noticing the absence of such coverage in plaintiff's policy. Lamb concluded, "If you are interest[ed] in purchasing this coverage in the future, kindly forward this completed application . . . so that we may obtain pricing on your behalf."

On March 30, 2007, Lamb wrote plaintiff's president regarding insurance renewals. In the letter, Lamb confirmed a conversation

on March 30, 2007, between plaintiff's president and Marshall, during which plaintiff's president declined coverage for Pollution Liability, Directors & Officers Liability, and Employment Practices Liability. On April 13, 2009, Lamb confirmed plaintiff's purchase of a new Directors & Officers Liability Policy, and an EPLI policy.

On February 8, 2010, Lamb informed plaintiff it may need to increase the amount of its "ERISA Bond" in order to comply with The Employee Retirement Income Security Act (ERISA), depending on the amount of assets in its retirement plan. On March 28, 2011, Lamb provided plaintiff's president with a Workers Compensation Renewal Quotation and a Management Liability Renewal Proposal for review. Lamb also included optional Crime Coverage and Increased Directors & Officers Liability limits for review.

On March 31, 2011, Lamb confirmed plaintiff's president declined primary flood coverage as originally quoted on a renewal proposal and noted, "Flood Coverage will be excess to the Missouri location as a result of this location being situated in a hazardous flood zone[,] according to Travelers' records." The email also noted plaintiff retained the Management Liability Program but declined optional Crime Coverage quotations. In a November 23, 2015 certification in support of plaintiff's cross-motion for partial summary judgment, plaintiff's counsel asserted unsolicited

flood coverage quotations were provided solely for plaintiff's Missouri facility in 2011 and 2012. In a December 1, 2015 certification, Marshall explained that once the high-hazard flood zone was determined, the policy would leave plaintiff without flood coverage in Missouri up to $500,000 on building loss and contents; therefore, Bollinger proposed the new coverage.

On September 5, 2014, plaintiff filed an amended complaint against Bollinger, alleging broker malpractice, negligence, breach of contract, violation of the implied covenant of good faith, and consumer fraud. On May 8, 2015, plaintiff filed a motion to disqualify the initial judge assigned to the case, vacate an April 10, 2015 order granting Bollinger's motion to compel and extend discovery, and transfer the venue from Hudson County to Essex County. Bollinger opposed plaintiff's motion.

On May 29, 2015, the initial judge granted plaintiff's motion to disqualify herself[4] and vacate her April 10, 2015 order. The initial judge declined to consider plaintiff's motion for a change of venue, but specifically stated, "If any party seeks a discovery extension and/or a change of venue, two motions must be filed as the Assignment Judge will hear all change of venue applications

---

[4] The judge noted, "This court failed to realize that Travelers is a party inasmuch as Travelers was neither the movant [nor] the opposing party on the [April 10, 2015] motion." The record shows the judge previously worked for a law firm that handled matters for Travelers.

and all matters in which this court has a conflict." Notwithstanding this direction, plaintiff did not file a change of venue motion with the Assignment Judge.

The case was then reassigned to Judge Schultz, who decided the cross-motions for summary judgment under review, granting Bollinger's motion for summary judgment and denying plaintiff's cross-motion for summary judgment. In a concise written opinion, Judge Schultz summarized each party's arguments. Bollinger contended it was not required "to advise a client of the need to raise its already existing limits or to provide any other manner of risk assessment services absent a 'special relationship[,]' which Bollinger asserts never existed." Plaintiff countered that a "special relationship" existed, but did not contend the relationship required Bollinger to merely advise plaintiff of higher policy limits; instead, plaintiff asserted the special relationship required Bollinger to solicit additional quotes for higher flood insurance limits and offer the quotes for higher coverage to plaintiff.

The judge noted, "Those cases that have found a special relationship involve situations where the special relationship was related to the special duty that was breached." In this case,

> The extensive discovery covering the twelve[-]year relationship between [plaintiff] and Bollinger involving many different insurance products provides fertile

8                                                          A-2182-15T4

ground for either proving a special relationship regarding providing actual quotes for specified higher limits or showing that there was no such relationship. The court is well satisfied that no such special relationship has been established. The plaintiff is in effect saying "you go first" meaning it was not sufficient for Bollinger to advise plaintiff of higher limits at higher costs and invite a request for same. Rather Bollinger should have listed all the possible quotes for all the possible higher limits. Since flood was only one type of insurance Bollinger provided [plaintiff], assumedly Bollinger was obligated to do the same with all the various categories of insurance it provided [plaintiff].

It is rather clear that there was no history of such a thing between the two. Bollinger's motion to dismiss counts alleging negligence and malpractice is <u>granted</u>.

The judge further concluded, "The record discloses no suggestion that 'but for' any alleged wrongdoings by Bollinger, Travelers would have paid more than they did. In fact, the record clearly establishes no proximate cause can be shown regarding these theories." Therefore, the court dismissed plaintiff's remaining claims against Bollinger.

Plaintiff moved for reconsideration, essentially arguing that when the court decided whether the parties' relationship gave rise to a legal duty, it decided issues of credibility and questions of fact not subject to summary judgment. Following oral argument, Judge Schultz denied plaintiff's motion, finding he did not

9

"overlook[] any law," misstate "any fact," or make "a credibility determination." This appeal followed.

## II.

When reviewing a grant of summary judgment, we employ the same standards used by the motion judge under Rule 4:46. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998). First, we determine whether the moving party has demonstrated there were no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230-31 (App. Div.), certif. denied, 189 N.J. 104 (2006). In so doing, we view the evidence in the light most favorable to the non-moving party. Brill, supra, 142 N.J. at 523. We accord no deference to the motion judge's conclusions on issues of law, Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 382-83 (2010); Manalapan Realty, L.P., v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), which we review de novo. Dep't of Envtl. Prot. v. Kafil, 395 N.J. Super. 597, 601 (App. Div. 2007).

It is well-settled that "to render a person liable on the theory of negligence there must be some breach of duty, by action or inaction, on the part of the defendant to the individual complaining, the observance of which duty would have averted or

avoided the injury." Brody v. Albert Lifson & Sons, Inc., 17 N.J. 383, 389 (1955). Determination of whether a duty exists turns on questions of "fairness and policy that, in turn, implicate many factors." Fackelman v. Lac d'Amiante du Quebec, 398 N.J. Super. 474, 486 (App. Div. 2008). "Th[is] inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solutions." Cheng Lin Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991) (quoting Kelly v. Gwinnell, 96 N.J. 538, 544 (1984)).

"The existence of a duty to exercise reasonable care to avoid a risk of harm to another is a question of law," Fackelman, supra, 398 N.J. Super. at 486, subject to our de novo review. "Of course, the legal determination of the existence of a duty may differ, depending on the facts of the case." Wang, supra, 125 N.J. at 15.

An insurance broker's liability for negligent acts affecting an insured has been addressed by our Supreme Court, which noted "[t]he import of the fiduciary relationship between the professional and the client is no more evident than in the area of insurance coverage." Aden v. Fortsh, 169 N.J. 64, 78 (2001).

> Insurance intermediaries in this State must act in a fiduciary capacity to the client "[b]ecause of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies." Walker v. Atl. Chrysler Plymouth, Inc., 216 N.J. Super. 255, 260 (App. Div. 1987) (quoting Sobotor v. Prudential

11

> Prop. & Cas. Ins. Co., 200 N.J. Super. 333, 341 (App. Div. 1984)); see also N.J.A.C. 11:17A-4.10 ("An insurance producer acts in a fiduciary capacity in the conduct of his or her insurance business."). The fiduciary relationship gives rise to a duty owed by the broker to the client "to exercise good faith and reasonable skill in advising insureds." Weinisch v. Sawyer, 123 N.J. 333, 340 (1991).
>
> [Id. at 78-79.]

The scope of the duty an insurance broker owes an insured was initially discussed in Rider v. Lynch, 42 N.J. 465 (1964). The facts in Rider reflect a prospective insured, who requested automobile liability coverage to address a unique set of circumstances, relied on the insurance broker's recommendation of the type of policy to procure to insure the potential risk from the intended use. Id. at 470-71. Actually, the policy's limitations, which were not revealed to the insured by the broker, excluded the identified risks. Id. at 471-74. Coverage was denied when a collision occurred. Id. at 474.

The broker who advised the insured to obtain a specific policy was held liable for damages resulting from the negligent procurement of insurance. Id. at 476. "The Court noted that because of the nature of the principal-agent relationship the broker was charged with the knowledge that the policy did not fit his client's need and, even if the broker was not aware of the limited policy coverage, he was under a duty to examine and reject

the policy himself before delivering it to the [insured]." Aden, supra, 169 N.J. at 80 (citing Rider, supra, 42 N.J. at 481). An insured is "entitled to rely upon and believe that the broker had fulfilled his [or her] undertaking to provide the coverage . . . agreed upon, and that the policy sent . . . represented accomplishment of that undertaking." Rider, supra, 42 N.J. at 482. The Court noted:

> One who holds himself [or herself] out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him [or her] to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He [or she] is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his [or her] principal seeks to be protected. If he [or she] neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he [or she] undertook to supply, because of his [or her] failure to exercise the requisite skill or diligence, he [or she] becomes liable to his [or her] principal for the loss sustained thereby.
>
> [Id. at 476.]

In President v. Jenkins, 180 N.J. 550, 569 (2004), the Court clarified the scope of an insurance broker's obligations to a prospective insured, stating the broker is responsible: "(1) to procure the insurance; (2) to secure a policy that is neither void nor materially deficient; and (3) to provide the coverage he or

she undertook to supply."  However, "[t]he duty of a broker or agent . . . is not unlimited."  Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Group, Inc., 135 N.J. 182, 190 (1994).

Absent a special relationship, "there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of a policy." Wang, supra, 125 N.J. at 11-12.  In Wang, the Court reviewed the parameters of liability, starting with Rider, "the seminal case . . . concerning a broker's liability to an insured," and its progeny.  Id. at 12.  The Court distinguished the basis for the duty this court found in Sobotor, wherein we ordered the automobile insurance policy reformed to increase the uninsured/underinsured motorist coverage because of the agent's failure to have provided the insured with the "best available" package of insurance, as the insured had requested.  Sobotor, supra, 200 N.J. Super. at 336, 341-43.  In that instance, we determined a "duty arises when there is a special relationship between the insurance agent and the client which indicates reliance by the client on the agent."  Id. at 338.  The Court acknowledged that the existence of a "special relationship" evincing reliance by the insured on the broker or agent could trigger liability.  Wang, supra, 125 N.J. at 15.

In Wang, however, because there were "no allegations of special relationship," the Court rejected the plaintiff's argument

14

to impose a duty upon insurers that "required them 'to periodically and regularly advise [the insureds] of a need to increase the limits of [their] insurance coverage in light of the appreciated value of their home[s], inflationary trends in the area, and increased recoveries being awarded to tort victims.'"  Ibid. (alterations in original).  The Court consequently determined "the policies had been routinely renewed, probably without any contact between the parties," id. at 16, and "the obligation to inform homeowners renewing their policies to consider higher liability limits was not encompassed by the recognized duty of care owed by agents to their insureds and, therefore, should be imposed, if at all, by the Legislature." Carter Lincoln-Mercury, supra, 135 N.J. at 190 (citing Wang, supra, 125 N.J. at 18-19).

Plaintiff argues Bollinger had a duty to provide additional flood quotes for plaintiff's Harrison facilities and breached that duty when it never provided additional quotes over their twelve-year relationship.  Plaintiff contends the court improperly relied on the "special relationship" analysis without considering the three other prongs of the four-prong Carter test.  Plaintiff also emphasizes a fiduciary duty New Jersey imputes on brokers.  See Aden, supra, 169 N.J. at 79.

Under the four-factor test, plaintiff first argues its relationship with Bollinger was strong, special, and unique

15                                              A-2182-15T4

relating to procurement of flood insurance. It asserts Bollinger was its exclusive broker for over a decade, would unilaterally review its insurance and make recommendations, and obtained additional flood limit quotes for plaintiff's Missouri location. Plaintiff further claims Bollinger's representative toured the facility on multiple occasions, and had a long relationship with plaintiff's president through their positions on an outside board. In its statement of facts, plaintiff suggests Marshall's visit put him on notice to the risks associated with the property and gave rise to a duty. See Indus. Dev. Assocs. v. F.T.P., Inc., 248 N.J. Super. 468, 471 (App. Div. 1991).

We disagree. Carter did not overrule Wang's holding that absent a special relationship, "there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of a policy." Wang, supra, 125 N.J. at 11-12. Moreover, Bollinger told plaintiff that "[h]igher limits or sub-limits may be available so please advise us if you are interested in higher limits options so that we may secure quotations for your consideration." Bollinger never told plaintiff anything that would reasonably cause plaintiff to rely on his quotes as recommendations for the proper amount of insurance coverage.

Next, plaintiff argues Marshall knew of the catastrophic risk of flood. Plaintiff stresses that Bollinger's 2012 renewal proposal listed $11,746,950 as the replacement cost for its Harrison buildings and their contents, an amount over ten times greater than the $1,000,000 flood limit for a property located in a flood plain. Bollinger's insurance proposal also clearly informed plaintiff of its ability to offer more insurance coverage. Bollinger did not have any more information than plaintiff, and nothing in the record shows Bollinger acted to cause plaintiff to rely on it to recommend the proper amount of insurance coverage.

Plaintiff also claims Bollinger could have requested additional quotes from Traveler's underwriter, Karen Ladner, who had authority to provide $5,000,000 in total flood limits. Assuming this is true, we find it irrelevant to whether or not Bollinger had a duty to provide additional quotes to plaintiff.

Finally, under the fourth factor, plaintiff cites the National Flood Insurance Act of 1968, 42 U.S.C.A. § 4011(c), to support its contention Bollinger's duty is in the public interest. According to plaintiff, reasonable skill, judgment, and experience dictate Bollinger should have known the $1,000,000 flood limit was inadequate. Plaintiff asserts finding a duty in this case comports with the broker's responsibility to exercise good faith and reasonable skill. We disagree. An insurance broker is not an

17

insurance consultant; if plaintiff wanted an insurance consultant, it could have retained one. Bollinger's policy proposal clearly stated it would receive payment from the insurer or another third party, and Bollinger did nothing to suggest it worked for anyone else.

Plaintiff cites various dicta in Wang, supra, 125 N.J. 2, which found the absence of a duty, to argue the duty of a broker may differ depending upon the facts of the case. However, Wang explicitly stated, "We conclude there is no common law duty of a carrier or its agents to advise an insured concerning the possible need for higher policy limits upon renewal of the policy." 125 N.J. at 11-12.

Plaintiff next contends Bollinger had a duty to provide quotes, not to advise on specific purchases. Plaintiff cites Walker, supra, 216 N.J. Super. at 260-61, in which this court considered reliance on specialized, professional expertise to find a duty to inform of available coverage, and plaintiff argues Bollinger told plaintiff to purchase other insurance coverage but never additional flood coverage, thereby creating this sort of reliance. Given Bollinger's offer to provide additional quotes of more flood insurance, we disagree.

Plaintiff argues Bollinger did not satisfy its duty when its proposal advised plaintiff that higher limits may be available.

Plaintiff asserts the motion judge should not have focused upon the presence or absence of a "special relationship" in determining Bollinger's duty, and additionally erred by improperly acting as a factfinder when she determined no such relationship existed. We disagree because we conclude Wang, supra, 125 N.J. at 11-12, required the trial court to determine whether the parties' past dealings established a special relationship. We further reject plaintiff's argument the judge improperly acted as a factfinder. The record reveals no genuine disputes as to any material facts.

Plaintiff further argues the judge should not have dismissed its claims for breach of implied duty of good faith and breach of contract. Plaintiff argues it sufficiently pled the failure to act as a claims advocate and a conflict of interest with Travelers, so the judge should not have dismissed these claims. This argument lacks merit. The record not only fails to support these alternative claims, but we also agree with Judge Schultz that "the record clearly establishes no proximate cause can be shown regarding these theories."

We further agree with Bollinger that the issue of venue is not appropriately before us because the initial judge declined to rule on the motion to transfer venue. Plaintiff does not argue the first judge erred when she declined to order a change of venue. Plaintiff should have secured a ruling from a subsequent judge if

19

it intended to challenge venue on appeal. Zaman v. Felton, 219 N.J. 199, 226-27 (2014); see also Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("[O]ur appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest"). We therefore decline to address the issue further.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION