242 N.J. Super. 293 (1990)
576 A.2d 907
RICHARD E. AVERY AND DONNA L. AVERY, PLAINTIFFS-RESPONDENTS,
v.
ARTHUR E. ARMITAGE AGENCY, DEFENDANT-APPELLANT, AND AETNA CASUALTY & SURETY COMPANY, DEFENDANT-RESPONDENT.
JOANNE NEWELL AND BEVERLY NEWELL, PLAINTIFFS-RESPONDENTS CROSS-APPELLANTS,
v.
THE OHIO CASUALTY INSURANCE CO., DEFENDANT-RESPONDENT, AND THE BROWN AGENCY, DEFENDANT-APPELLANT.
DOROTHY E. BOCK, PLAINTIFF-RESPONDENT,
v.
HARTFORD INSURANCE COMPANY, DEFENDANT-RESPONDENT, AND STOCKWELL KNIGHT COMPANY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 1990.
Decided June 27, 1990.
*296 Before Judges SHEBELL, BAIME and KEEFE.
Michael O. Kassak argued the cause for the appellants, Arthur E. Armitage Agency, The Brown Agency and Stockwell Knight Company (White and Williams, attorneys; Michael O. Kassak, and Ralph P. Catalano on the briefs).
Vincent J. Ciecka argued the cause for the respondents, Richard E. and Donna L. Avery (Michael Rakoski, on the brief).
William M. Honan argued the cause for the respondent Aetna Casualty & Surety Company (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys; William M. Honan, of counsel; Nicholas L. Paone and William M. Honan, on the brief).
Salvatore Alessi argued the cause for the respondent, The Ohio Casualty Insurance Company (Fratto, Alessi & Abbott, attorneys; John A. Fratto, on the brief).
John F. Kearney, III argued the cause for the respondents, cross-appellants, Joanne and Beverly Newell.
Michael Rakoski argued the cause for the respondent, Dorothy E. Bock (Vincent J. Ciecka, attorney; Michael Rakoski, on the brief).
Christine M. Cote argued the cause for the respondent, Hartford Insurance Company (Cooper, Perskie, April, Niedelman, Wagenheim and Levenson, attorneys; Barry D. Cohen, of counsel, Christine M. Cote, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Leave to appeal was granted to the defendant insurance brokers in these three unrelated cases involving common questions of law after partial summary judgment was granted in favor of the plaintiffs in each case against the insurance brokers, while at the same time dismissing the brokers' claims for indemnity against the defendant insurance companies. The *297 common questions we now address in all three cases are: (1) What is the scope of an insurance broker's duty to advise a client concerning uninsured motorist (UM) and underinsured motorist (UIM) coverage in light of the passage of N.J.S.A. 39:6A-23 and N.J.S.A. 17:28-1.1? (2) Was the evidence produced on the summary judgment motions sufficient to establish a breach of that duty, i.e., negligence, as a matter of law? (3) If the insurance brokers were negligent, must the insurance companies indemnify the brokers for their negligence?
We answer those questions by holding that the plaintiffs in each case have presented sufficient facts to establish that a duty existed on the part of the defendant brokers. However, each case presents genuine fact issues concerning the breach of that duty which must be resolved at a plenary trial. We also hold that if a defendant broker is found liable at trial, the defendant insurance company has no obligation to indemnify the broker for the broker's negligence. Thus, for the reasons stated herein, we reverse the partial summary judgments entered in favor of the plaintiffs against the defendant brokers but affirm the summary judgment entered in favor of the defendant insurance companies on the brokers' claims for indemnification.
While there are some variations in the facts from case to case, the three cases share common theories of liability and defense. For example, in each case the plaintiff was insured under an automobile policy containing the minimum UM/UIM limits of $15,000/$30,000 for bodily injury, but plaintiffs' liability coverage for bodily injury was $100,000/$300,000. Each plaintiff was involved in an accident which occurred after May 15, 1984 and/or July 1, 1984, the critical dates referred to in N.J.S.A. 39:6A-23. Plaintiffs Bock and Newell contend that the responsible parties for each of their respective automobile accidents had limits of liability in amounts that do not fully cover their injuries. They contend that if they had UIM coverage in the amounts of their liability coverage, such coverage would be sufficient to satisfy their excess claims. However, *298 because each plaintiff had UIM limits of only $15,000/$30,000 for bodily injury, the same as the liability coverage carried by the responsible tortfeasors, UIM recovery was unavailable to them. See N.J.S.A. 17:28-1.1(e)(1)(2) (defining UIM coverage). See also Longworth v. Van Houten, 223 N.J. Super. 174, 177-78, 538 A.2d 414 (App.Div. 1988).
Plaintiff Avery on the other hand was involved in an accident with an uninsured motorist. He claims that his UM coverage of $15,000/$30,000 for bodily injury was insufficient to compensate him for his injuries but his UM coverage would have been sufficient had his broker sold him UM coverage in the same amount as his liability coverage.
All plaintiffs claim that they would have insured themselves for UM/UIM coverage up to the limits of their liability coverage had they known of its availability and minimal cost. Consequently, they allege that their brokers were negligent in failing to properly advise them about the available coverage. They also claim that the defendant insurance companies failed to inform them of the available coverage as required by statute (N.J.S.A. 39:6A-23) and regulation (N.J.A.C. 11:3-15.1 to -15.9).
The defendant brokers deny that they had any duty to the plaintiffs. They argue that the passage of N.J.S.A. 39:6A-23 evidences a legislative decision to place the burden of informing and advising insureds of available UM/UIM coverage on the insurance companies. In the alternative, they argue that, if a duty exists under these facts, there are genuine fact issues relevant to its breach requiring a plenary trial. Finally, they contend that, if liability is established against them, the insurance companies are required to indemnify them by reforming the respective policies to reflect the appropriate coverage.
The defendant insurance companies contend that they are not required to indemnify an independent broker for the broker's negligence occurring in the context of a broker giving advice to a client relative to the availability and cost of optional insurance coverage. Defendants Hartford and Ohio further contend that, *299 should liability be established against them at trial for failure to comply with their statutory obligation of notification, they are at best joint tortfeasors and not indemnitors.[1]

I
Our analysis begins by tracing the duty owed by an insurance broker to a client prior to the passage of N.J.S.A. 39:6A-23 and N.J.S.A. 17:28-1.1. We then address the question of whether the Legislature intended, by passing those statutes, to change or modify in any way the broker's common law duty as it evolved to that point. Next, we discuss the differences between an agent and broker in the context of an insurance company's duty to indemnify an agent/broker for his wrongdoing. Finally, we resolve those issues which are peculiar only to the cross-appeal by plaintiffs Newell.
Although the distinction between an insurance broker and an insurance agent is important in determining the appropriate remedy resulting from a breach of that duty, as will be seen later, the distinction is irrelevant when discussing the duty owed to a client. Sobotor v. Prudential Property & Cas. Ins. Co., 200 N.J. Super. 333, 491 A.2d 737 (App.Div. 1984).
We see no reason why the duty owed by a broker to a client should differ from the duty owed by an agent. The difference between a broker and an agent lies in the duties and responsibilities owed to the insurance carrier, not to the insured. [Id. at 337, n. 1, 491 A.2d 737].
In these three cases it is undisputed that defendants Armitage (Avery's broker), Stockwell-Knight (Bock's broker) and Brown (Newell's broker) were insurance brokers because they had "no special employment from the [insurance companies] but [rather] solicit[] business from the public generally and when obtained, offer[] it on behalf of [their] client, either directly to the *300 carrier[s] or to one of [their] agents." John Roach, Jr., Inc. v. Pingpank, 39 N.J. Super. 336, 339, 121 A.2d 32 (App.Div. 1956). See also N.J.S.A. 17:22-6.2.
In Rider v. Lynch, 42 N.J. 465, 201 A.2d 561 (1964), the seminal case on the subject, the Supreme Court defined the duty of a broker as follows:
One who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. He is expected to possess reasonable knowledge of the types of policies, their different terms, and the coverage available in the area in which his principal seeks to be protected. [Id. at 476, 201 A.2d 561].
Liability for breach of that duty can occur if the broker (1) "neglects to procure the insurance," (2) "if the policy is void," (3) if the policy is "materially deficient," or (4) the policy "does not provide the coverage he undertook to supply." Id.
The listing of the circumstances in Rider under which liability can be imposed clearly suggests that proof of something more than the mere existence of a broker-customer relationship is required to trigger the broker's legal duty. In every case but one since Rider was decided, the customer has initiated some contact with the broker concerning either the procurement or renewal of coverage. Bates v. Gambino, 72 N.J. 219, 370 A.2d 10 (1977) (request for fire insurance coverage); Harr v. Allstate Ins. Co., 54 N.J. 287, 255 A.2d 208 (1969) (request by insured to cover business merchandise stored in insured's basement); Fenwick Machinery, Inc. v. A. Tomae & Sons, Inc., 159 N.J. Super. 373, 388 A.2d 250 (App.Div. 1978), rev'd adopting dissent of J. Michels, 79 N.J. 590, 401 A.2d 1087 (1979) (request for coverage of construction equipment); Winans-Carter Corp. v. Jay & Benisch, 107 N.J. Super. 268, 258 A.2d 131 (App.Div. 1969) (request for fire insurance coverage); Pearson v. Selected Risks Ins. Co., 154 N.J. Super. 240, 381 A.2d 91 (Law.Div. 1977) (request for automobile coverage). Even cases addressing UM/UIM coverage have followed this same principle. Mazur v. Selected Risks Ins. Co., 233 N.J. Super. 219, 558 *301 A.2d 508 (App.Div. 1989) (customer requested "full coverage" on his pick-up truck used part-time delivering fire wood similar to the coverage on his automobile); Johnson v. Mac Millan, 233 N.J. Super. 56, 558 A.2d 24 (App.Div. 1989) (broker in making coverage recommendations to customer failed to advise about existence of UIM insurance); Dancy v. Popp, 232 N.J. Super. 1, 556 A.2d 331 (App.Div. 1988), aff'd 114 N.J. 570, 556 A.2d 312 (1989) (verbal discussions with broker regarding coverage selections); Walker v. Atl. Chrysler Plymouth, 216 N.J. Super. 255, 523 A.2d 665 (App.Div. 1987) (request by customer to "cover us"); Sobotor, 200 N.J. Super. at 336-37, 491 A.2d 737; (request for automobile coverage).
The only case we have located which suggests that a broker has an affirmative duty to initiate contact with his customer regarding coverage matters is Wasserman v. Wharton, Lyon & Lyon, 223 N.J. Super. 394, 538 A.2d 1270 (App.Div. 1988). However, in that case the client and broker had received notice from the insurer that the insurer was unilaterally withdrawing UIM coverage. (This occurred prior to the 1983 amendment to N.J.S.A. 17:28-1.1.) The duty was predicated upon the broker's failure to advise plaintiff, a long-term client, of the availability of the coverage through another insurer at a nominal charge. Id. at 407, 538 A.2d 1270. There may be other instances, now unknown to us, which may fairly require the duty announced in Rider to be imposed on a broker to act affirmatively without the customer initiating contact with the broker. For example, the duty may expand based upon developing trade customs as established through expert testimony on the subject. See Bates, 72 N.J. at 225-26, 370 A.2d 10; DiMarino v. Wishkin, 195 N.J. Super. 390, 393-94, 479 A.2d 444 (App.Div. 1984) (The standards announced in Bates, applicable to a broker, are "minimums."). However, in the absence of expert testimony, we have recently held, specifically in the field of UM/UIM coverage, that where there has been no initiating inquiry from the client/insured, the broker has no duty to initiate contact with the insured concerning the existence of additional *302 UM/UIM options. Bruce v. MacLean, 238 N.J. Super. 501, 570 A.2d 49 (Law.Div. 1989), aff'd 238 N.J. Super. 408, 570 A.2d 1 (App.Div. 1989); Pinto v. Garretson, 237 N.J. Super. 444, 450, 568 A.2d 119 (App.Div. 1989).
In each of the cases now under consideration it can fairly be said that some contact with the broker was initiated by the plaintiff-client concerning the renewal of automobile coverage. The nature of the contact will be hereinafter discussed in the context of whether the brokers' breached their duty as a matter of law. Suffice it to say that we are satisfied, as was the motion judge, that the facts of each case are sufficient to invoke the brokers' duty set forth in Rider. "It is not necessary for the client in order to establish the existence of the duty to prove that he laid out for the broker the elements of a contract of insurance." Rider, 42 N.J. at 477, 201 A.2d 561. Even "vague" requests for coverage as in Sobotor, 200 N.J. Super. at 342, 491 A.2d 737, may invoke the broker's duty to advise the client. See also Walker, 216 N.J. Super. at 260, 523 A.2d 665.
Liability resulting from the breach of duty is justified on the theory that a broker "ordinarily invites [his clients] to rely upon his expertise in procuring insurance that best suits their requirements." Rider, 42 N.J. at 477, 201 A.2d 561. Thus, a broker's liability has turned on whether the broker's conduct invited reliance, or the client's conduct exhibited or justified a claim of reliance. See, e.g., Dancy, 232 N.J. Super. at 4-5, 556 A.2d 331. (Question of fact as to degree of reliance insured placed on agent's representations even in light of his execution of coverage selection form for UM/UIM coverage lower than his liability limits.); Wasserman, 232 N.J. Super. at 406, 538 A.2d 1270. (Fact issue presented as to whether insured was obligated to seek further explanation from broker as to the meaning of a notice sent by the insurer as well as the obligation of the broker, who received the same notice, to recommend purchase of coverage deleted by notice.); Citta v. Camden Fire Insurance Assoc., Inc., 152 N.J. Super. 76, 78, 377 A.2d 779 *303 (App.Div. 1977) (Agent not liable for failing to advise insured of expiration date of policy "on the cogent ground that the insured is charged with knowledge of the expiration date stated in the policy."); Cox v. Santoro, 98 N.J. Super. 360, 365-66, 237 A.2d 491 (App.Div. 1967) (Broker breached no duty to insured for failure to inform insured that son would not be covered driving a relative's car where insured had 40 years experience in the insurance business and the policy was unambiguous.). As can be seen from the forgoing cases the question of whether the duty has been breached cannot always be decided as a matter of law.
Therefore, once having established the existence of a duty under the facts in these cases, the question then becomes whether reasonable minds could differ on the facts presented to the motion judge as to whether the duty owed was breached. If reasonable minds could differ on the answer, a plenary trial is necessary and summary judgment cannot be entered.
We have found only a few instances in which the broker's liability has been established as a matter of law. Those occasions are limited to fact situations where the evidence permits no conclusion other than that the broker was ignorant of available coverage, failed to obtain requested coverage, or failed to advise the customer of the unavailability of requested coverage. Bates, 72 N.J. at 223, 370 A.2d 10; Johnson, 233 N.J. Super. at 61, 558 A.2d 24; Auger v. Gionti Agency, 218 N.J. Super. 360, 527 A.2d 928 (App.Div. 1987), certif. granted 109 N.J. 504, 537 A.2d 1293 (1987), app. dism. 113 N.J. 348, 550 A.2d 459 (1988); Sobotor, 200 N.J. Super. at 341-42, 491 A.2d 737. None of those circumstances exist here.
Whether the defendant brokers acted reasonably in discharging their duty to the plaintiffs herein must also be analyzed in the context of the statutory and regulatory law at the relevant time period. UIM coverage came into the statutory law of New Jersey with the passage of L. 1983, c. 65, § 5 and L. 1983, c. 362, § 1 which amended N.J.S.A. 17:28-1.1. As a *304 result of that legislation, UM coverage was mandated for every New Jersey driver at a minimum of $15,000/$30,000 for bodily injury. N.J.S.A. 17:28-1.1(a). In addition, insurers were required to offer UIM as optional coverage up to $250,000/$500,000 for bodily injury. Id. at (b). However, neither UM nor UIM coverage could be written in amounts greater than the liability limits selected by the insured. Prior to those amendments, insurance companies were only required to provide optional UM coverage in the amount of $15,000/$30,000 for bodily injury.
However, the amendment to N.J.S.A. 17:28-1.1 was only a part of the broader insurance reform legislation known as The New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984 (L. 1983, c. 362). As pertains to this case, that legislation required that a written notice, buyers guide and coverage selection form be sent by May 15, 1984 to all insureds whose policies were in force on July 1, 1984 and, thereafter, accompany any notice of renewal for policies "with an effective date subsequent to July 1, 1984." N.J.S.A. 39:6A-23(b)(c). The written notice was required to contain "a brief description of all available policy coverages and benefit limits, and identifying which coverages are mandatory and which are optional under State law, ...." Id. at (a).
The statute also required the Commissioner of Insurance to promulgate regulations for the written notice and buyer's guide. Id at (c). The Commissioner complied with the legislative directive and promulgated regulations that became effective on April 2, 1984. N.J.A.C. 11:3-15.1 to -15.9. Those regulations, in part, provided that the insured's "current policy coverage" would remain in effect unless the insurer received a properly executed selection form from the insured. N.J.A.C. 11:3-15.8(c). Finally, the regulations provide:
The buyer's guide and written notice incorporate and therefore satisfy any and all other notice requirements previously set forth for the coverage options required by the New Jersey Automobile Reparation Reform Act, the New Jersey Automobile Insurance Reform Act of 1982 and the New Jersey Automobile *305 Insurance Freedom of Choice and Cost Containment Act of 1984. [N.J.A.C. 11:3-15.9].
Moreover, the Commissioner required that a letter formulated by the Department of Insurance be included with the written notice, buyers guide and selection form in the initial mailings to insureds. The letter, in part, contained the following statements in bold-face type.
THE FACT IS THAT A LOT [OF] PEOPLE BUY INSURANCE THAT THEY DON'T NEED OR WON'T USE. THAT DOESN'T MAKE SENSE.
WHEN YOU TALK TO YOUR AGENT OR BROKER AND HE OR SHE TELLS YOU THAT THE LAWS ARE COMPLEX, OR THAT IT MIGHT BE UNWISE TO PURCHASE LESS COVERAGE, EVALUATE HIS OR HER COMMENTS IN LIGHT OF YOUR OWN NEEDS, BUT ALSO WITH THE RECOGNITION THAT THE AGENT DEPENDS ON YOUR INSURANCE FOR HIS OR HER LIVELIHOOD. THE HIGHER YOUR PREMIUM, THE HIGHER HIS OR HER COMMISSION.
* * * * * * * *
SELECTING THE $1,500 THRESHOLD SHOULD RESULT IN FEWER LAWSUITS. FEWER LAWSUITS MAY MEAN FEWER ATTORNEYS' FEES BUT FEWER LAWSUITS ALSO MEAN LOWER AUTOMOBILE INSURANCE PREMIUMS.
PLEASE HELP CONTROL INSURANCE COSTS  READ THE ENCLOSED MATERIAL  NEW JERSEY LAW REQUIRES THAT YOU BUY SOME INSURANCE ... BE A SMART CONSUMER AND ASK QUESTIONS BEFORE YOU BUY MORE THAN YOU NEED.
Arguably, the legislative and regulatory design, as evidenced by the Commissioner's letter, was to create a milieu in which New Jersey insureds would inform themselves about available coverage from the written notice and buyer's guide and make intelligent choices based on that information, asking for their agent's/broker's assistance if they had questions.
Plaintiffs Avery and Bock deny ever having received the material required to be mailed to them on or before May 15, 1984 and with each succeeding renewal notice. Newell admits to having received such information but cannot recall whether it was before her daughter's accident. However, she admittedly misconstrued the content of the documents believing that they related only to cost savings and reducing coverages, a *306 topic with which she was not interested. She threw the material away without reading it fully.
The motion judge found that Avery's insurer, Aetna, complied with its statutory and regulatory obligation and granted summary judgment to Aetna on plaintiff's claim. The judge specifically found:
The court finds these proofs are so conclusive as to the question of mailing as to permit the court to find as a matter of law that the Averys received the requisite explanatory documents from Aetna.
As indicated earlier, Avery does not cross-appeal from that determination. See Bruce, 238 N.J. Super. at 505-08, 570 A.2d 49. (Addressing identical proofs as to Aetna.) However, the motion judge found that Bock's insurer (Hartford) and Newell's insurer (Ohio) had not submitted sufficient proofs to resolve the question as a matter of law, leaving the issues as to Hartford and Ohio open for plenary trial. Thus, it is possible that a fact finder may conclude not only that the material was sent as required but that it was also received by Bock and Newell before the accidents in question.
It is clear that the Legislature could have placed the statutory obligations outlined in N.J.S.A. 39:6A-23 on agent/brokers as well as insurers. However, it chose not to do so. Recently we have held that an agent/broker has "no affirmative, independent duty to communicate with [an insured] concerning the availability of additional underinsured coverage." Pinto, 237 N.J. Super. at 450, 568 A.2d 119. See also Bruce, 238 N.J. Super. at 508-09, 570 A.2d 49. Pinto distinguished Sobotor on the grounds that Mr. Pinto, unlike Mr. Sobotor, was not "seeking information about coverage." Pinto, 237 N.J. Super. at 450, 568 A.2d 119. Bruce distinguished Sobotor on the grounds that Sobotor involved the "adequacy of a response to an inquiry." Bruce, 238 N.J. Super. at 508, 570 A.2d 49.
We believe that the facts of these cases lie somewhere between the specific inquiry and inadequate response situation presented in Sobotor which permitted finding liability as a matter of law, and the no affirmative duty to give unsolicited *307 advice, and thus the no liability situations, as in Pinto and Bruce. On motions for summary judgment the motion judge is required to treat the evidence in opposition to the motion "indulgently" and resolve all reasonable inferences against the movant. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954). Issues that inherently turn on the credibility of the witness should be resolved by the trier of fact. Id. The motion judge relied heavily on Sobotor in coming to the conclusion that the defendant brokers were negligent as a matter of law. However, Sobotor reminds us that "[e]ach case must be decided on its own peculiar facts." Sobotor, 200 N.J. Super. at 338, 491 A.2d 737 (quoting Hardt v. Brink, 192 F. Supp. 879, 881 (W.D.Wash. 1961)). The facts in Sobotor are considerably different from the facts in the present cases. In Sobotor, defendants conceded that plaintiff, at the very least, asked for the "best available" package of insurance in connection with his request for $100,000/$300,000 liability coverage. Id. at 336, 491 A.2d 737. The $15,000/$30,000 UM/UIM coverage written by the agent was not the best available coverage. At that time (1980), Prudential would have written UM/UIM coverage at plaintiff's liability limits for only a $5 additional premium. Id. It was undisputed that Mr. Sobotor's discussion with the agent related to coverage, his request was specific, and his reliance on the agent was unmistakable. The broker simply failed to provide the insurance that the client had requested. In that respect, Sobotor was not unlike Bates, Auger, and Johnson, where liability was established as a matter of law.
In these cases the plaintiffs' conversations with the respective brokers were less definitive than Mr. Sobotor's. In addition, the brokers do not admit the content of the conversations plaintiffs claim to have taken place actually occurred.
Brief excerpts of the relevant depositions were submitted to the motion judge in each case. Our review of those depositions reveals the following. In the Avery case, Mr. Avery admitted that he had no conversation with the broker, or his employees. *308 He understood that his wife's discussions were limited to matters concerning their change of address and vehicles to be covered and did not include coverage questions. However, Mrs. Avery's testimony on the subject is as follows:
Q. Do you have any specific recollection of ever asking anyone from the Armitage Agency for the best coverage available or Cadillac coverage or anything along those lines?
A. No, we just wanted the best that our money could buy because of the kids that's what we were concerned about, our children being in the car.
Q. But did you ask for the best coverage available?
A. Yes. That our money could afford, yes.
Q. You specifically recall saying that?
A. Yes. That's always been our problem, just, you know, moneywise, get what you can afford.
Mr. Armitage, on the other hand, testified that he was of the impression that Mrs. Avery's phone call to the office was simply to obtain a premium quote "for the [renewal] policy because the Averys had been transferred by the Aetna from another agent to Armitage."[2] The letter sent by Mr. Armitage's secretary, the person with whom Mrs. Avery spoke, contains information concerning the amount of the renewal premium, thus supporting Mr. Armitage's impression.
Moreover, Mr. Armitage recognized the importance of the changes brought about by the new legislation. He claims to have sent a letter to his clients alerting them to the fact that they would be receiving information from their insurers concerning the changes and invited his clients to contact him if they had questions.
A trier of fact could reasonably conclude that Mrs. Avery made no inquiry about coverage or that the inquiry made by her did not reasonably invoke an obligation on the broker's part to respond by advising Mrs. Avery about optional increased uninsured motorist coverage. Further, a fact-finder could reasonably *309 conclude that in view of the structure of the legislation and the regulations, and in view of the broker's letter to his clients, the broker was reasonable in waiting for inquiries from clients about the new optional coverages.
In Bock, Mrs. Bock at one point in her testimony, stated that she never discussed "coverage" with anyone at the Stockwell Knight Agency or Hartford before her accident. However, at another point in her deposition, she states that she asked for "the best possible coverage that [she] could afford" to an unknown person at some undesignated time before the accident. This is the type of testimony that a broker cannot easily deny by certification in opposition to a motion for summary judgment. We find the testimony on its face to be so indefinite and contradictory as to create a genuine fact issue.
Moreover, Mrs. Bock's accident occurred on August 20, 1985. Her policy was renewed in April of 1985. The buyer's guide was required by statute to be included in the renewal notice. In addition, her insurer (Hartford) was required to mail her the same material by May 15, 1984. Depending on the proofs offered by Hartford at trial, the trier of fact could conclude that Mrs. Bock received the material, read it, understood it and was satisfied with her coverage.
In Newell, Mrs. Newell claims to have spoken to Mr. Brown in approximately December 1984 when she was putting her daughter back on the policy. She said: "I just wanted the best possible coverage I could get.... I just wanted him to give me a little information about the insurance." She understood Mr. Brown's reply to her inquiry as follows:
I interpreted what Mr. Brown said to me is he didn't have time to spend with every one of his clients to discuss everything about it.
* * * * * * * *
It was my responsibility to find out what I needed and to know something about insurance essentially. I don't think any man could possible have told me everything possible about insurance coverages. I was being told that it was my responsibility to find out what I needed and get it.
Q. Was there reference to the law changing?
A. About the laws changing in New Jersey concerning insurances because of the no fault laws and everything else and how things were changing, yeah. *310 He said there were so many changes going on so rapid that it was hard to keep up with all of them.
Mr. Brown denied that he would have directed a client who inquired about coverages to a third party source for information. While the question presented by the sparse information afforded us is a close one, we cannot say that the evidence contains the level of confidence necessary to find as a matter of law that only one conclusion can be drawn from it.
Moreover, Beverly Newell's accident occurred on April 16, 1985. Her mother's policy was renewed a month before. As we observed in Bock, depending on the proofs offered by Ohio, a jury could conclude that Mrs. Newell received the buyer's guide several months before the accident as well as in May of 1984 and, despite her denials, read it, understood it and was satisfied with her coverage. Further, Mrs. Newell disclaimed interest in reading the buyer's guide because it contained cost cutting information, a subject which did not interest her because it meant less rather than more coverage. However, there is some evidence in the record that Mrs. Newell was indeed interested in saving money on insurance premiums and, for that reason, Beverly was placed on Mrs. Newell's former husband's automobile policy for a short time. This latter evidence, we think, is relevant on the question of whether Mrs. Newell would have been interested in increasing her UIM coverage in any event.
Except in the clearest of cases we believe these intricate issues concerning the breach of a broker's duty to an insured should be resolved in a plenary trial. Such a result is more in keeping with the Supreme Court's analysis in Dancy, in which the Court found a triable issue of fact concerning the agent's negligence even where the insured signed the coverage selection form. 114 N.J. at 572-73, 556 A.2d 331.

II
We now turn to the issue of indemnity as between the brokers and the insurers. The general rule is that an insurer is *311 not liable for the negligence of a broker, as distinct from an agent, where the negligence stems from advice that the broker has given to the insured. Rider, 42 N.J. at 475, 201 A.2d 561; but cf. Harr, 54 N.J. at 293, n. 1, 255 A.2d 208. (distinguishing agent-employee liability).
Three recent Appellate Division cases have addressed the relationship between an insurance broker and insurer when the broker has negligently failed to perform its duty to a client in some fashion. In Regino v. Aetna Cas. & Sur. Co., 200 N.J. Super. 94, 490 A.2d 362 (App.Div. 1985), plaintiff purchased a front-end loader and called its broker to request that the new machine be added to its policy. Defendant broker telephoned defendant insurance company "and verbally bound the coverage." Id. at 98, 490 A.2d 362. However, the broker "failed to confirm the oral binder by a written request, and as a result the machine was not added to plaintiff's policy." Id. When the machine was stolen, defendant Aetna denied plaintiff's claim. Affirming the trial court's judgment granting the broker's claim for indemnification against Aetna, we said:
[B]ecause the insurer has failed to demonstrate that it would not have insured the loss had the agent acted properly, it cannot claim that the loss was `proximately caused by' the agent's negligence. [Citations omitted]. Aetna did not attempt to establish it would not have insured the risk; it insured plaintiff's other business-insurance needs and issued an oral binder on the stolen equipment. In these circumstances Adams' [broker's] negligence was not the proximate cause of Aetna's liability. Even if Adams had not been negligent, the theft still would have occurred and Aetna would have covered it. [Id. at 99, 490 A.2d 362].
In Johnson, we said that the negligence of an agent is imputable to the principal only when the agent is an employee of the principal, which was the situation in Sobotor, 233 N.J. Super. at 61-62, 558 A.2d 24. "Ordinarily, however, and absent special circumstances, the negligence of a non-employee agent, i.e., an independent contractor, is not imputed to the principal." Id. at 62, 558 A.2d 24 (citation omitted). We then noted the existence of an "Agency Agreement," and concluded that:

*312 ... [T]he broker/agent's status is a hybrid one. When he acts for the company within the terms of the agreement, he is then acting as its authorized agent in such a manner that his acts are its acts. [Id.].
This analysis provided the basis for distinguishing Regino as follows:
This is precisely what happened in Regino v. Aetna Cas. & Sur. Co., supra. There, an independent broker with the authority to bind coverage telephoned Aetna and bound coverage so verbally. He failed thereafter to confirm the coverage in writing, as he was obliged to do by his agency agreement with the carrier, and, consequently, the appropriate policy never issued. We there held that the broker's negligence was imputable to the insurer and that the policy should, therefore, be reformed to include the omitted coverage. But the conceptual basis of our doing so clearly rested upon the premise that once the binder was verbally communicated, the company was on notice of its obligation and that notice, moreover, justified reformation since the broker, in performing the binding function, was acting primarily as the company's agent rather than the client's. Here, however, the function which was negligently performed by the broker was not one encompassed by the scope of its agency for the company. Rather, it was one involving only its relationship to its client and was the very function to which Rider ascribed the duty of acting with `the degree of skill and knowledge requisite to his calling.' 42 N.J. at 477, 201 A.2d 561. [Johnson, 233 N.J. Super. at 62-63, 558 A.2d 508].
However, we said that the question of the insurer's negligence was relevant "since, if it had been negligent, it would have been a joint tortfeasor owing joint and several liability to plaintiffs and a duty of contribution to [the broker]." Id. 233 N.J. Super. at 64, 558 A.2d 508 (footnote omitted). Further, in a footnote, we observed: "Obviously, Puffer's [the broker's] negligence precludes it from obtaining a common-law indemnification remedy from [the insurer.]" Id. at 64, n. 2, 558 A.2d 508 (citations omitted). Johnson ultimately determined that because the carrier was not negligent or otherwise at fault, reformation of the policy was inappropriate.
Mazur v. Selected Risks Ins. Co., 233 N.J. Super. 219, 558 A.2d 508 (App.Div. 1989), followed the decision in Johnson. Mr. Mazur requested that his insurance broker obtain "full coverage" on a pickup truck he used to deliver firewood. Id. at 221-22, 558 A.2d 508. The broker erroneously believed that any medical bills Mazur incurred in an accident with the truck would be covered under his employee's medical insurance. The *313 broker thus recommended and obtained less expensive commercial coverage which did not include personal injury protection benefits or medical payments coverage. Id. at 222, 558 A.2d 508. Mazur was injured in an accident in the truck and discovered that he had no insurance to cover his resulting medical bills. Id. at 222-23, 558 A.2d 508. The only issue on appeal was whether the negligent broker was entitled to indemnification from its non-negligent principal, the insurer. Citing Restatement, Agency 2d, § 440 (1958), Ramos v. Browning Ferris Ind. of South Jersey, Inc., 103 N.J. 177, 190, 510 A.2d 1152 (1986), and Johnson, we concluded that the broker was not entitled to indemnification. Mazur, 233 N.J. Super. at 224-27, 558 A.2d 508. Regino was distinguished in the same way as Johnson distinguished it: the agent was not acting for the carrier in evaluating the client's insurance needs and making recommendations to the client. Rather, the agent was acting only for the client. Id. at 226-27, 558 A.2d 508.
In the Avery case, as in Johnson, the "Agency Agreement" authorizes Armitage appellant "to bind and execute contracts of insurance]" for which "the company accepts responsibility." Johnson, 233 N.J. Super. at 62, 558 A.2d 508. Armitage does not contest the motion judge's determination that it is "independent." Armitage testified that he was not an employee of Aetna, and that he was "independent." Thus the relationship here between Armitage and Aetna is analogous to the agent-insurer relationships in Johnson and Mazur. Here, as in Johnson and Mazur, if Armitage is found to be negligent in failing to advise plaintiffs of the availability of additional optional uninsured motorist coverage such negligence was not within the scope of Armitage's agency for Aetna. Rather, the negligence arose from Armitage's relationship to plaintiffs, its clients. Thus, contrary to Armitage's argument, the instant case is unlike Regino, and it is irrelevant that Aetna would have issued the additional coverage. Further, as we said in Johnson, Armitage's negligence, if found, "precludes it from *314 obtaining a common-law indemnification remedy" from Aetna. Id. at 64, n. 2, 558 A.2d 508.
Armitage also contends that Aetna was at fault in failing to "inform the Armitage Agency of the changes in the law promulgated... by the Cost Containment Act" and by failing to provide Armitage with "any guidance...." However, Armitage cannot plead ignorance. In his deposition, Mr. Armitage said that Aetna advised him that the forms were being mailed, and sent him copies. Armitage was clearly knowledgeable about the availability and desirability of optional UM/UIM coverage. Indeed, if Armitage had not known about the availability of optional UM/UIM coverage, that ignorance would constitute "professional negligence as a matter of law." Id. at 61, 558 A.2d 508.
The same principles, of course, apply to the relationship between the brokers (Stockwell-Knight and Brown) and the insurers (Hartford and Ohio) in the Bock and Newell cases. Neither broker denies that it is "independent." However, in Bock and Newell, unlike Avery, the insurer's liability has not been decided. If the insurers are found to be negligent and their respective brokers are also found to be negligent, the brokers and insurers are joint tortfeasors. Id. at 64, 558 A.2d 508. Common law indemnity would also be inappropriate. Id. at 64, n. 2, 558 A.2d 508. In such a case, reformation may very well be the appropriate remedy. See id at 64, 558 A.2d 508.

III
Finally, we address the issues raised by the Newells in their cross-appeal. The Newells contend that Ohio's buyer's guide and coverage selection form did not adequately inform them of the availability of or offer additional UIM coverage, as required by N.J.S.A. 17:28-1.1, N.J.S.A. 39:6A-23, and N.J.A.C. 11:3-15 et seq. Plaintiffs also argue that their motion for summary judgment against Ohio should have been granted because Ohio failed to appear and defend.
*315 The intent and purpose of the New Jersey Automobile Insurance Reform Act of 1982, L. 1983, c. 65, was
[t]o provide by the enactment of all these reforms that automobile insurance will be affordable, available, and more equitable to the motorists of this State....
[L. 1983, c. 65, § 2; N.J.S.A. 17:29A-34(j)].
One of the reforms to which this section refers is "an increase in uninsured motorist coverage, and underinsured motorist coverage for private passenger automobile insurance." L. 1983, c. 65, § 2; N.J.S.A. 17:29A-34(h). To this end both the Automobile Insurance Reform Act, supra, § 5, and the New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984, L. 1983, c. 362, § 1 amended N.J.S.A. 17:28-1.1 and also created N.J.S.A. 39:6A-23.
Pursuant to the mandate of N.J.S.A. 39:6A-23, as described earlier in this opinion, the Department of Insurance produced a sample buyer's guide, written notice and coverage selection form. 16 N.J. Reg. 254(d). It also promulgated N.J.A.C. 11:3-15, "Automobile Insurance Standards for Buyer's Guide/Written Notice." 16 N.J. Reg. 733.
Plaintiffs contend that Ohio's buyer's guide/written notice and coverage selection form do not satisfy either the regulations or the statutes, and do not "constitute a meaningful offer of increased limits of UIM...." Although plaintiffs raised this issue in their motion for summary judgment, the motion judge made no direct determination. His opinion assumed that the insurance companies satisfied their obligation to advise plaintiffs if they mailed the documents when required. However, in imposing an independent duty to inform on the brokers, the judge described the documents in question as "a sea of paper which may inform but does not advise." Plaintiffs assert that they neither inform nor advise.
We have considered plaintiff's arguments on this issue and conclude that Ohio's buyer's guide/written notice and coverage selection form do comply with the regulations promulgated by the Department of Insurance since they are nearly identical to *316 the Department's samples. 16 N.J. Reg. 254(d). These samples "satisfy the minimum standards for the content of the Written Notice and Buyer's Guide as contained in N.J.A.C. 11:3-15.1 et seq." 16 N.J. Reg. 254(d)(1). Insurers could use different language from the sample but "shall not substantially alter the essential nature of the material." Id. Ohio combined the written notice and buyer's guide, as permitted by 16 N.J. Reg. 254(d). The Preamble of Ohio's "Buyer's Guide/Written Notice" is identical to the one in the Department's sample. See 16 N.J. Reg. 255. Although some of the sections dealing with personal injury protection are rewritten and slightly expanded, Ohio's "IV. Uninsured/Underinsured Motorist Coverage," is identical to that section in the sample. See 16 N.J. Reg. 257. Ohio's Coverage Selection Form is also identical to the sample produced by the Department of Insurance. See N.J. Reg. 261-62.
Plaintiffs contend that even if the documents do satisfy the regulations, they still do not satisfy the statutory mandate to provide UIM coverage as an option. N.J.S.A. 17:28-1.1. According to plaintiffs, statutory construction is the duty of the judiciary and an agency's interpretation of a statute that is contrary to its plain meaning is invalid. We construe the argument to be an indirect attack on the regulations. However, under Cumberland Farms, Inc. v. Moffett, 218 N.J. Super. 331, 337, n. 2, 342, 527 A.2d 913 (App.Div. 1987), agency regulations may be challenged after they are promulgated on constitutional grounds or on the grounds of the agency's authority to adopt them, but may not be challenged "as-applied." This issue was considered in Pinto,
Pinto had been informed  in language required by New Jersey statutes and regulations  of the availability of increased limits of coverage. The Buyer's Guide/Written Notice, which was mailed to Pinto by Allstate, satisfied the statutory notice requirement. N.J.A.C. 11:3-15.9. Allstate certainly had no further duty to communicate directly with Pinto, to advise him of the importance of the notice, or to recommend that he purchase additional insurance coverage. [Pinto, 237 N.J. Super. at 449-50, 568 A.2d 119].
*317 Plaintiffs also contend that since Ohio failed to defend plaintiffs' summary judgment motion, plaintiffs' motion should have been granted. However, R. 4:46-5(a) provides for the granting of summary judgment against a party who does not respond "if appropriate." In the instant case the motion judge properly determined that summary judgment against Ohio was not appropriate. If Ohio sent Mrs. Newell the buyer's guide/written notice and coverage selection form before May 15, 1984 with the notice of renewal, it satisfied its legal duty to plaintiffs. If it sent these papers after the accident, it did not satisfy its legal duty to plaintiffs. A trial is required to determine when it sent the documents.
Plaintiffs complain that their motion to strike the answer and defenses of Ohio for failure to answer interrogatories should have been granted. The motion judges made no direct ruling on this motion. R. 4:23-5(a) provides:
If timely answers to interrogatories are not served and no formal motion for an extension has been made pursuant to R. 4:17-4(b), the ... answer of the delinquent party shall be dismissed or stricken by the court....
The rule also provides for vacating the order of dismissal or suppression when the interrogatories are answered and a fine is paid. Ohio represents that it has now answered plaintiffs' interrogatories. We remand the matter for further consideration in light of these developments. See Aujero v. Cirelli, 110 N.J. 566, 542 A.2d 465 (1988).
Plaintiffs contend that the motion judge erred in "transferring the matter to the Law Division and allowing trial by jury." We observe that the broker demanded trial by jury. Because the claim is one for negligence both as to the broker and Ohio, the matter involves a cause of action traditionally tried to a jury, if demanded. Equitable relief in the form of reformation may be afforded by the Law Division judge if appropriate under the principles previously discussed. In Weinisch v. Sawyer, 237 N.J. Super. 195, 567 A.2d 259 (App. Div. 1989), certif. granted ___ N.J. ___ (1990), the court determined that plaintiff was entitled to a jury trial in an action *318 against Allstate Insurance Company and its employee-agent, alleging negligent failure to advise plaintiff of the availability of increased optional uninsured motorist coverage.
In conclusion, the partial summary judgments entered in favor of all plaintiffs and against the defendant brokers are reversed. The summary judgments entered in favor of the insurers on the question of indemnification are affirmed as is the order transferring the cases to the Law Division for trial by jury.
However, in light of the foregoing we consider it more appropriate in the Bock and Newell cases to try the issue of the brokers'/insurers' liability first. If the insurers are found liable, the policy may be reformed and the matter can proceed to arbitration under the policy. If in the same case a broker is found liable with the insurer, the broker shall contribute to the arbitration award as a joint tortfeasor. We do not perceive in those circumstances that the broker's right to trial by jury on damages has been impaired. We say this because the broker's negligence proximately resulted in the failure to increase limits of UIM/UM coverage under a contract of insurance which the broker knows provides for arbitration of such claims. The broker may of course participate in that arbitration. However, if either in Bock or Newell, a broker is found liable alone, then the matter can proceed to a separate trial in the automobile liability/damage context with the broker paying any money damages assessed in that latter proceeding.
The same considerations do not apply to the Avery case because Aetna is no longer a party and reformation is unavailable as a remedy. However, in the interest of efficiency, we believe that the case against the broker should be tried first. Should the broker succeed in that litigation, a second trial is unnecessary. If, on the other hand the broker loses, it is possible that the second suit can be obviated by reason of a settlement.
*319 The matters are remanded for further proceedings in compliance with this opinion.
SHEBELL, J.A.D., concurring in part and dissenting in part.
I disagree with my colleagues only on the issue of indemnification of the brokers by the carriers. I disagree not on the basis of their analysis of conventional legal theory, which I find to be impeccable, but on the basis of the economic utility of the rule they adopt. It makes no economic or market sense to allow the insurance carrier to benefit by receiving a fat premium for providing expanded $100,000/$300,000 liability coverage from the broker's sales efforts and then to stick the broker with the entire liability for failing to sell the same level of coverage for UM/UIM coverage, where the premium, if it were provided, would be no more than a few dollars extra.
Here, with UM/UIM coverage, as in Regino v. Aetna Cas. & Sur. Co., 200 N.J. Super. 94, 490 A.2d 362 (App.Div. 1985), with additional vehicles, the carrier is compelled to write the additional coverage, up to the same level as the liability coverage, if the insured requests it. N.J.S.A. 17:28-1.1. The carriers in each of these cases wrote the coverage as forwarded by the brokers and were well aware of the vast difference between the liability limits of coverage and the limits applicable to UM/UIM coverage. It cannot be doubted that any reasonable motor vehicle owner, if directly told of the slight additional cost for the additional limits of UM/UIM coverage, having agreed to pay for higher limits of liability coverage, would choose to obtain additional UM/UIM and thereby directly benefit from the higher coverage. The insurance industry is aware of this but has seen fit in large measure to benefit economically by taking the higher liability premium and not providing corresponding limits of UM/UIM coverage unless compelled by the Legislature and the policyholder.
The Legislature has recognized that it is in the public interest to have higher limits of UM/UIM coverage available and that *320 the burden of providing information regarding it is best placed upon the insurance carrier. N.J.S.A. 17:28-1.1, N.J.S.A. 39:6A-23. We can better further this policy by requiring indemnification in these circumstances where the carriers have actually written and been paid for the higher limits of liability coverage. Indeed, the industry itself has, by not adopting a single policy limit for liability and UM/UIM coverage, created a great deal of litigation and its related expense, and has burdened the courts because of the obvious public confusion caused by the disparate limits.
The insurance industry can protect itself by providing UM/UIM coverage to match the liability coverage limits on all of its motor vehicle policies. This may also serve to lower the rates for the extra coverage and will undoubtedly reduce litigation and put the economic burden where it belongs. Therefore, I would hold in these circumstances that the carriers must indemnify the brokers if the brokers are held liable. The brokers' liability to the carriers should be limited to the cost of the additional premium.
NOTES
[1] Defendant Aetna in the Avery case was found to have complied with its statutory obligation as a matter of law. That decision has not been appealed. Therefore, Aetna's only exposure in the Avery case is as an indemnitor of Armitage. Aetna participates in this appeal on that issue only.
[2] We acknowledge the hearsay nature of this testimony. However, Mr. Armitage's deposition was submitted to the trial judge without objection as to the limitation of its content.