Bruce **GEBHARDT** and Celeste Gebhardt, Plaintiffs,

v.

**ALLSPECT, INC.** and Bruce Rickard, Defendants/Third–Party Plaintiffs,

v.

Bankers Insurance Co. and Associations Liability Insurance Agency, Inc. Third–Party Defendants.

No. 00 CIV 0062(WCC).

United States District Court, S.D. New York.

Dec. 20, 2001.

Herold and Haines, P.A., Warren, NJ (Sheryl M. Schwartz, of Counsel), for defendants & Third-Party plaintiffs.

Law Offices of Kenneth G. Gerard, , New York, NY (Kenneth G. Gerard, of Counsel), for Third–Party Defendant Bankers Insurance Co.

Marshall, Conway & Wright, P.C., New York, NY (Christopher T. Bradley, Stacey H. Snyder, of Counsel), for Third–Party Defendant Associations Liability Insurance Agency, Inc.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Bruce and Celeste Gebhardt brought the instant action against Allspect, Inc. ("Allspect") and Bruce Rickard [1] alleging, *inter alia*, breach of contract and gross negligence arising out of a home inspection performed by Allspect for plain-

---

1. Plaintiffs proceeded against Rickard under a theory of corporate veil piercing. In an Opinion and Order dated December 3, 2001, this Court granted defendants' motion for partial summary judgment on the corporate veil issue and dismissed all claims brought personally against Rickard. Allspect thus remains the only defendant in plaintiff's action. When discussing actions taken by Rickard on behalf of Allspect, we will refer solely to Allspect.

tiffs. After their former insurer Bankers Insurance Company ("BIC") denied coverage for plaintiffs' claims, Allspect filed a Third–Party Complaint against BIC for breach of contract and against the brokerage agency Associations Liability Insurance Agency, Inc. ("ALIA") for negligence. ALIA and BIC both moved for summary judgment pursuant to FED. R. CIV. P. 56(b). Allspect then cross-moved for partial summary judgment against BIC. For the reasons stated below, BIC's motion is granted, Allspect's cross-motion is denied and ALIA's motion is denied.

## BACKGROUND

The facts underlying the Gebhardts' claim against Allspect are already outlined in this Court's earlier ruling denying defendant's motion to dismiss, *Gebhardt v. Allspect*, 96 F.Supp.2d 331, 332–33 (S.D.N.Y.2000), and knowledge of these facts is assumed. The facts relevant to the instant motions for summary judgment follow.[2]

■■■ Allspect, a New Jersey corporation of which Rickard is director and sole shareholder, is in the business of conducting home inspections. (Allspect Mem. Opp. ALIA Summ. J. at 3.) On November 9, 1999, Allspect applied for membership in the Foundation of Real Estate Appraisers ("FREA"), a trade association whose membership includes home inspectors.

(ALIA's Rule 56.1 Stmt. ¶¶ 4, 11.) One benefit of membership in FREA is access to group insurance benefits including errors and omissions ("E & O") insurance for professional home inspection services. (Allspect Mem. Opp. ALIA Summ. J. at 3.) ALIA, which is incorporated and has its principal place of business in California, serves as the insurance brokerage agency responsible for procuring insurance for FREA members. (ALIA Rule 56.1 Stmt. ¶ 4.) The E & O insurance coverage offered to FREA members is under a claims-made[3] group master policy issued by BIC to FREA (Bonny Aff. ¶ 7; ALIA Mem. Supp. Summ. J., Ex. D.) According to ALIA, at the time Allspect applied for FREA membership, no other E & O coverage was available for members through FREA. (Bonny Aff. ¶ 7.)

Prior to applying for FREA membership, Allspect was insured by Executive Risk Indemnity ("Executive") under an E & O policy providing retroactive coverage to May 1992, but was required to find a new insurance carrier after Executive announced it would no longer underwrite insurance policies for home inspection services. (*Id.* at 3–4.) To secure new coverage, Rickard contacted FREA to discuss the nature of the insurance offered to its members. (Rickard Aff. ¶ 2; Allspect Mem. Opp. ALIA Summ. J. at 3.) Upon contacting FREA, Rickard was directed to David Brauner, an alleged

**2.** The relevant facts are taken from each party's Rule 56.1 Statement, and the briefs and affidavits submitted in support of and in opposition to the motions for summary judgment.

**3.** A "claims-made" insurance policy covers claims that are discovered and brought to the attention of the insurance company during the period of the policy. Some claims-made policies, such as the one provided by BIC, include a retroactive date. If the error or

omission giving rise to the claim took place before the retroactive date of these policies, no coverage exists. (ALIA Mem. Supp. Summ. J., Ex. E.) A claims-made policy differs from an "occurrence" policy which covers errors or omissions occurring during the period of the policy, regardless of the date of discovery. For a discussion of the differences between the two types of policies see *Zuckerman v. National Union Fire Ins. Co.*, 100 N.J. 304, 495 A.2d 395 (1985).

agent of ALIA.[4] According to Rickard, he advised Brauner of the insurance coverage provided by Executive, including the May 1992 retroactive date, and requested a policy providing the same coverage. (Rickard Aff. ¶ 4.) Brauner allegedly recommended that Rickard purchase the claims-made insurance policy offered by BIC under the group insurance program sponsored by FREA.[5] Brauner advised Rickard that the only policy available through FREA provided a maximum retroactive date of three years. (*Id.* ¶ 6.) Rickard contends that he then made it clear to Brauner that he wanted a policy with a retroactive date adequate to ensure coverage for potential claims that might arise in the future. (*Id.*) According to Rickard, Brauner advised him that the coverage provided by the BIC policy would be "sufficient", and that he and Allspect would be adequately protected.[6] (*Id.*) Rickard allegedly relied on this advice when choosing to purchase the BIC policy offered by ALIA. (*Id.* ¶ 7.) In order to secure this coverage, Allspect applied for membership in FREA and applied for BIC's insurance policy. (ALIA Rule 56.1 Stmt. ¶ 11.) On Allspect's ap-plication form, in the space asking for the desired effective date of insurance coverage, Rickard filled in "11/15/99", the three-year maximum offered to FREA members, as advised by Brauner. (ALIA Mem. Supp. Summ. J., Ex. F.) The BIC policy ultimately issued to Allspect through ALIA covered a one-year term from November 15, 1999 to November 15, 2000 and provided for retroactive coverage to November 15, 1996.

On December 30, 1999, approximately a month after Allspect was accepted as an FREA member, plaintiffs filed a Complaint against Allspect alleging, *inter alia,* that Allspect's gross negligence in performing a home inspection on August 4, 1996 ("August inspection") caused them to suffer damages estimated at $2,000,000. On August 19, 2000, after this Court denied Allspect's motion for summary judgment, Rickard submitted the summons and related court documents in the instant action to BIC and demanded defense and indemnification under the insurance policy. (BIC Mem. Supp. Summ. J., Ex. T.) On September 19, 2000, BIC denied coverage on the ground that the retroactive date for the policy was November 15, 1996, which

---

4. In his affidavit in opposition to ALIA's motion for summary judgment, Rickard alleges that Brauner is a representative of ALIA. (Rickard Aff. ¶ 3.) The pleadings submitted by Allspect also imply that an agency relationship exists between Brauner and ALIA. (3d-Party Complt. ¶¶ 4–9, 23–26.) However, in their reply memorandum, ALIA states for the first time that Brauner "is not and never has been employed by ALIA" and denies that Rickard ever spoke to a representative of ALIA. (ALIA Reply Mem. Supp. Summ. J. at 6–7.) Because the Court at this time is not presented with any evidence with respect to the relationship between Brauner and ALIA, we will accept as true Allspect's allegation that Brauner is a representative or agent of ALIA.

5. The group claims-made master policy issued by BIC to FREA was titled "Bankers Insur-ance Company Home/Commercial Inspection Consultants Errors and Omissions Insurance Policy, Group Master Claims Made Policy # 26–817 Issued to the Florida Office of the Foundation of Real Estate Appraisers." (ALIA Mem. Supp. Summ. J., Ex. E.)

6. In their reply brief, ALIA claims that this statement from Rickard's affidavit is contradicted by his deposition testimony and that this Court should disregard the statement with respect to the issue of whether Brauner advised Rickard that the retroactive date would be sufficient. (ALIA Reply Mem. Supp. Summ. J. at 7.) ALIA's assertion, however, is incorrect. In his deposition testimony, Rickard clearly states he accepted a retroactive date of three years "since [Brauner] *said it would be sufficient."* (ALIA Mem. Supp. Summ. J., Ex. G, p. 181.)

was after the date of the August inspection. On September 25, 2000, Allspect's attorney called BIC's claim department with respect to plaintiffs' claim against Allspect, and allegedly notified them that plaintiffs had advised her that they intended to amend their pleadings to assert an additional claim of negligence based on a second inspection conducted by Allspect in December of 1996. (Schwartz Aff. ¶ 2.) When Allspect's policy term with BIC expired on November 15, 2000, Rickard chose not to renew insurance coverage with BIC and instead obtained a policy from Lexington Insurance Company. (BIC Mem. Supp. Summ. J. at 2.)

Plaintiffs filed an Amended Complaint in this action on January 12, 2001 in which they asserted a claim with respect to the second home inspection conducted by Allspect on December 14, 1996 ("December inspection"). Consequently, Allspect's attorney sent a letter to BIC's claims representative on January 17, 2001 requesting coverage for the December inspection which occurred within the retroactive period of the policy. (*Id.*, Ex. W.) On February 7, 2001, BIC again denied coverage on the ground that the Amended Complaint was not reported until January 23, 2001, which was after the expiration of the reporting period under the policy. (*Id.*, Ex. X.)[7] Therefore, on February 23, 2001, Allspect filed the instant Third-Party Complaint alleging breach of contract by BIC and negligence by ALIA and requesting both equitable and monetary relief.

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

### II. *Choice of Law*

▇▇▇ A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, courts are to apply the law of the jurisdiction "which has the most significant contacts with the matter in dispute." *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954). In cases involving insurance contracts "im-

---

7. The letter states that the reporting period is 30 days after the last effective date of the policy which was 12/15/00 for Allspect. (*Id.*)

portant factors considered by New York courts in making this determination include the 'location of the insured risk, residence of the parties, and where the contract was issued and negotiated.'" *Evvtex Co. v. Hartley Cooper Assoc. Ltd.*, 911 F.Supp. 732, 738 (S.D.N.Y.1996) (quoting *Avondale Indus., Inc. v. Travelers Indemnity Co.*, 774 F.Supp. 1416 (S.D.N.Y.1991); *Munzer v. St. Paul Fire & Marine Ins. Co.*, 208 Misc. 313, 145 N.Y.S.2d 633, 635 (3d Dep't 1989)) (additional citations omitted).

The instant action involves the interests of a number of states. The "location of the insured risk" was primarily New York and New Jersey. Rickard testified that Allspect conducted home inspections in New York and New Jersey, and also advertised in both states (Rickard Dep. at 68, 207). However, the underlying claim that is the subject of this lawsuit arises from actions which took place in New York. (Rickard Aff. ¶ 11.) With respect to the residence of the parties, Allspect is incorporated and has its principal place of business in New Jersey, and Rickard's residence is located in New Jersey. (Rickard Dep. at 12, 17.) ALIA is incorporated and has its principal place of business in California (Bonny Aff. ¶ 3), and BIC has its principal place of business in Florida. (BIC Mem. Supp. Summ. J. at 7.) The terms of the insurance contract at issue were discussed over the telephone with ALIA's representative in California and Rickard in New Jersey. (Rickard Dep. at 174.) It is assumed that Rickard filled out

the insurance application in New Jersey and returned the completed form to FREA's office in California. (ALIA Mem. Supp. Summ. J., Ex. F.) Although there are a number of states with an interest in this litigation, on balance we find that New Jersey has the most significant contacts with the disputed matters in the Third–Party Complaint.[8] New Jersey law will therefore be applied.

### III. *Breach of Contract Claim Against BIC*

#### A. *Allspect's Claim*

Allspect concedes that in light of the retroactive date of November 15, 1996, its policy with BIC did not cover the claim arising out of the August inspection ("August claim").[9] (Allspect Mem. Opp. BIC Summ. J. at 1.) However, Allspect maintains that under the terms of its insurance contract with BIC, coverage exists for the claim relating to the December inspection ("December claim"). Allspect's Third–Party Complaint asserts that BIC's failure to provide a defense or indemnification for the December claim constitutes a breach of contract. (3d-Party Complt. ¶ 20.) BIC, on the other hand, maintains that no coverage exists because the December claim, which was separate and distinct from the August claim, was not made or reported during the policy period.[10]

Allspect argues that it gave proper notice of the December claim to BIC within the policy period. Allspect's attorney

---

**8.** This conclusion does not impact the determination of the law that governs the plaintiffs' amended complaint.

**9.** Although BIC, in their supporting papers, presented arguments for why its insurance policy did not cover the August inspection, Allspect responded that it "[did] not seek coverage for the August 1996 inspection." (Allspect Mem. Opp. BIC Summ. J. at 1.)

**10.** BIC presents an alternative argument against coverage even if the December claim is not considered distinct from the August claim. Because Allspect also argues that the December claim constitutes a distinct claim, we do not consider BIC's secondary argument.

states that she telephoned BIC's claims department on September 25, 2000 and "specifically advised BIC that the Plaintiffs had advised [her] that they intended to amend their pleadings to assert an additional claim of negligence based upon a second home inspection conducted by the Defendants in December of 1996." (Schwartz Aff. ¶ 2.) Allspect's attorney further explains that she was unable to provide the actual amended pleading at that time because it had not yet been filed. (*Id.* ¶ 3.) According to Allspect, this conversation establishes that "BIC had been provided with actual notice and was fully aware of [the December claim] prior to the termination date of the Policy on November 15, 2000." (Allspect Mem. Opp. BIC Summ. J. at 8.) Allspect therefore maintains that a genuine issue of fact exists as to BIC's obligation to defend and indemnify the December claim.

BIC contends, however, that it is indisputable that Allspect's policy with BIC does not cover the December claim. According to BIC, coverage for this claim is precluded by the plain terms of the insurance contract. BIC first points to the policy's definition section which defines a "claim" as "a written demand made against a Member for monetary compensation including the service of a suit or the institution of arbitration or dispute resolution proceedings." (BIC Mem. Supp. Summ. J. at 20, Ex. P.) In light of this definition, BIC argues that the December claim did not arise until the Amended Complaint was filed in January of 2001 because this was the first time that a written demand was made against Allspect for monetary compensation. (*Id.* at 20.) Because no written demand relating to the December inspection was made against Allspect within the policy period, BIC argues that no claim existed until after the policy had expired. (*Id.*)

BIC also refers to the notice provision of Allspect's insurance policy. The relevant language of this provision states:

> Upon becoming aware of a Claim that would be covered under the Policy, the Member shall have the non-delegable duty hereunder of tendering direct written notice of such Claim directly to the Company as soon as practicable. Such written notice must contain full particulars of the Claim, including, but not limited to, the demand, any other legal process and a narrative description of all circumstances giving rise thereto. Written notice to the Company of a Claim must be given whether or not the amount demanded falls within or exceeds the Deductible Amount.

(*Id.*, Ex. P.) BIC thus argues that even if the December claim did arise within the policy period, Allspect did not give proper notice as required by the plain language of the policy. (*Id.* at 20–21.)

### B. *Interpretation of the Insurance Policy*

 Under New Jersey law insurance policies are considered contracts of adhesion and are therefore subject to special rules of interpretation. *Longobardi v. Chubb Ins. Co. of New Jersey,* 121 N.J. 530, 582 A.2d 1257, 1260 (1990) (citation omitted). Therefore, in interpreting insurance policies, "contracts will be construed in accordance with the reasonable expectations of the average policy holder and any ambiguity must be resolved against the insurer." *Aviation Charters, Inc. v. Avemco Ins. Co.,* 335 N.J.Super. 591, 763 A.2d 312, 314 (2000) (citing *Gibson v. Callaghan,* 158 N.J. 662, 730 A.2d 1278, 1282–83 (1999)). Generally, however "the words of an insurance policy are to be given their plain ordinary meaning." *Gibson,* 730 A.2d at 1282. "In the absence of any ambiguity, courts 'should not write for the insured a better policy of insurance than

the one purchased.'" *Id.* (quoting *Longobardi,* 582 A.2d at 1260) (additional citations omitted).

In the policy at issue, BIC cites unambiguous provisions in support of their argument that no coverage exists for the December claim. Allspect apparently argues that the December claim arose when plaintiffs advised Allspect's attorney of their intention to amend their pleadings to assert the second claim. (Schwartz Aff. ¶ 2.) However, the definition of "claim" contained in BIC's policy does not cover this type of act. Although not containing an exclusive list of examples, the definition clearly requires a "written demand" made against a member. *See infra* Part III.A. No construction of the terms of the contract would lead to the conclusion that the plaintiffs asserted a "claim" against Allspect when they orally informed Allspect of their intention to amend their complaint.

█ Nevertheless, even assuming that plaintiffs' actions could be construed as a "claim" under BIC's policy, Allspect indisputably failed to comply with the plain language requirements of the policy's notice provision. *See infra* Part III.A. Allspect contends that BIC was given timely notice of the December claim because it was "expressly advised" by Allspect of plaintiffs' intent to amend their complaint. (Allspect Mem. Opp. BIC Summ. J. at 10.) In support of this argument, Allspect points to BIC's internal records which reflect that Allspect's attorney had a telephone conversation with BIC's claim adjuster on September 25, 2000. (*Id.,* Ex. A.) Allspect further argues that this con-

versation constituted sufficient notice to BIC because, under New Jersey law, the event that triggers coverage under a claims-made policy is "transmittal of notice of the claim to the insurance carrier." (*Id.* (citing *Medical Inter Ins. Exch. of N.J. v. Health Care Ins. Exch.,* 278 N.J.Super. 513, 651 A.2d 1029, 1033 (1995) and *Zuckerman,* 495 A.2d at 406).) We note first that BIC's internal records reproduced by Allspect in relation to the conversation of September 25, 2000 do not make any mention of Allspect's December inspection.[11] However, even if Allspect can establish that its attorney gave oral notice of the prospective December claim during this telephone conversation, the Court is still required to find that Allspect did not give timely notice of this claim pursuant to the unambiguous terms of the policy.

BIC's policy plainly requires that notice of a claim against an insured be given in writing. There are no exceptions to this requirement. The cases that Allspect cites in support of its contention that coverage is triggered once notice is "transmitted" to the insurance carrier do not change this outcome. Nowhere in those cases is it implied that any form of transmission of notice is sufficient to trigger coverage, regardless of the terms of the insurance contract. To the contrary, New Jersey courts have held that "an extension of the notice period in a 'claims made' policy constitutes an unbargained-for expansion of coverage, *gratis,* resulting in the insurance company's exposure to risk substantially broader than that expressly insured against in the policy." *Zuckerman,* 495 A.2d at 406. Because Allspect did not

---

11. BIC's internal records from 9/25/00 state: SPOKE WITH [INSURED'S] ATTORNEY: She states that she believes the day he did his reinspection where he was told of his errors, which was 11/15/96, triggers coverage. She also said that the closing on the house was not until 12/12. I advised her if he overlooked the alleged defects on 8/15/96, that is when the error and omission took place. She will send a formal request for coverage; otherwise our position remains the same. (Allspect Mem. Opp. BIC Summ. J., Ex. A (capitalization in original).)

provide written notice of the December claim, as required by the unambiguous terms of BIC's policy, until well after the policy period expired, no coverage exists for that claim as a matter of law. Therefore, BIC's motion for summary judgment is granted and Allspect's cross-motion for summary judgment is denied.

## IV. *Negligence Claim Against ALIA*

While acknowledging that BIC's policy does not cover the August inspection as a result of the retroactive date of November 15, 1996, Allspect claims that ALIA's negligence caused it to procure an insurance policy with insufficient retroactive coverage. According to Allspect, in deciding to purchase the insurance offered by BIC through FREA, Rickard relied on ALIA's representation that BIC's policy and the retroactive date would be "sufficient" to protect Allspect's insurance needs. (3d-Party Complt. ¶¶ 24, 25.) In arguing for summary judgment, ALIA maintains that it did not breach any duty owed to Allspect; it merely placed insurance for Allspect under BIC's group policy with the inception date and retroactive date requested in Allspect's application. (ALIA Mem. Supp. Summ. J. at 15.) ALIA further argues that the best available coverage offered to FREA members contains a maximum retroactive date of three years, and that Rickard clearly understood the extent of the coverage he could obtain through ALIA. (*Id.* at 3.) Thus, ALIA contends that it owes no duty to Allspect as a matter of law, and that summary judgment is therefore appropriate.

Under New Jersey law "[i]nsurance intermediaries [ ] must act in a fiduciary capacity to the client 'because of the increasing complexity of the insurance industry and the specialized knowledge required to understand all of its intricacies.' "

*Aden v. Fortsch*, 169 N.J. 64, 776 A.2d 792, 800 (2001) (quoting *Walker v. Atlantic Chrysler Plymouth, Inc.*, 216 N.J.Super. 255, 523 A.2d 665 (1987)) (additional citations omitted). In the seminal New Jersey case defining brokers' duties to their clients, the court explained that:

> [o]ne who holds himself out to the public as an insurance broker is required to have the degree of skill and knowledge requisite to the calling. When engaged by a member of the public to obtain insurance, the law holds him to the exercise of good faith and reasonable skill, care and diligence in the execution of the commission. . . . If he neglects to procure the insurance or if the policy is void or materially deficient or does not provide the coverage he undertook to supply, because of his failure to exercise the requisite skill or diligence, he becomes liable to his principal for the loss sustained thereby.

*Rider v. Lynch*, 42 N.J. 465, 201 A.2d 561, 567 (1964). The *Rider* court further explained that liability of a broker for negligent procurement of insurance exists because "an insurance broker, in dealing with his clients, ordinarily invites them to rely upon his expertise in procuring insurance that best suits their requirements." *Id.*

A number of decisions following *Rider* have reiterated and clarified the duty owed by brokers to their clients. *See, e.g., Aden*, 776 A.2d at 800 ("The fiduciary relationship gives rise to a duty owed by the broker to the client to exercise good faith and reasonable skill in advising insureds."); *Sobotor v. Prudential Prop. & Cas. Ins. Co.*, 200 N.J.Super. 333, 491 A.2d 737, 739 (1984) (a broker owes to those engaging in its services reasonable skill, care and diligence); *see also Harr v. Allstate Ins. Co.*, 54 N.J. 287, 255 A.2d 208 (1969) ("Recognition is given to the usual and justifiable reliance by the purchaser

on the agent, because of his special knowledge, to obtain the protection he desires and needs, and on the agent's representations . . . ."); *Tomaszewski v. McKeon Ford, Inc.*, 240 N.J.Super. 404, 573 A.2d 501, 503 (1990) ("The agent's duty to act is [ ] not only dependent on what the insured requests by way of coverage, *i.e.,* the insured's 'desires,' but also what the insured's circumstances require to fulfill the expectations for which the insurance is being purchased, *i.e.,* the insured's unarticulated 'needs.' ").

It has further been explained that there are three non-exclusive circumstances in which a *prima facie* case of negligence could be established against a broker.

> An insurance broker may be held liable for his failure to exercise the requisite skill or diligence if he fails to issue the insurance policy he has promised to procure, if he assures the insured that he is covered whereas he is not, or if he procures a policy which is materially deficient.

*Industrial Dev. Assoc. v. F.T.P. Inc.*, 248 N.J.Super. 468, 591 A.2d 682, 684 (1991) (quoting *Cox v. Santoro*, 98 N.J.Super. 360, 237 A.2d 491 (1967)) (internal citations omitted); *see Glezerman v. Columbian Mut. Life Ins. Co.*, 944 F.2d 146, 150 (3d Cir.1991) (explaining that the New Jersey Supreme Court has held that broker's liability is not limited to these three circumstances). New Jersey courts have also stated that "[r]egardless of the type of coverage sought, a client should be entitled to rely on the special skill and knowledge possessed by the agent in order to best obtain the desired coverage." *Walker,* 523 A.2d at 667.

In the instant action, Allspect has provided evidence from which a jury could reasonably find that ALIA's failure to exercise the requisite professional skill and expertise caused Allspect to procure a "materially deficient" policy. Rickard asserts that he consulted with ALIA to secure "proper and sufficient liability insurance" for himself and Allspect. (Rickard Aff. ¶ 3.). He maintains that he informed ALIA of the breadth of coverage previously provided to Allspect by Executive, including the retroactive date of May 21, 1992, and requested complementary coverage from the policy ALIA would obtain. (*Id.* ¶ 4.) Although ALIA informed Rickard that the policy offered through FREA only provided a maximum three-year retroactive date, Rickard asserts that ALIA advised him that this coverage would be "sufficient" and that he and Allspect would be "adequately protected" under BIC's policy. (*Id.* ¶ 6.) According to Rickard, he relied on ALIA's expertise and advice in purchasing BIC's policy under the impression that the policy would sufficiently cover his and Allspect's insurance needs. (*Id.* ¶ 7.) Rickard further maintains that "[h]ad ALIA advised me that Allspect and/or I might have personal exposure for suits filed against us for inspections that occurred prior to November 15, 1996, I would have obtained insurance from another source." (Rickard Aff. ¶ 9.) [12]

Drawing all inferences in favor of Allspect, as we are required to do on summary judgment, it is apparent that a genuine issue of material fact exists as to whether ALIA breached its duty to use reasonable skill, care and diligence in pro-

---

12. ALIA's assertion that the Court should discredit this statement based on Rickard's deposition testimony admitting that he rejected the offer to purchase tail coverage from Executive and that "he was aware that having longer retroactive coverage was preferable" (ALIA Reply Mem. Supp. Summ J. at 7–8) is unpersuasive. Rickard's awareness of other insurance options does not require the conclusion that he would not have pursued these options if informed of the risk of exposure under BIC's policy.

curing the type of coverage Allspect requested. ALIA allegedly represented that it could provide Allspect with "sufficient" coverage, and Allspect allegedly relied on this representation in choosing to purchase BIC's policy through FREA. However, the insufficiency of coverage provided by BIC's policy is evident in Allspect's exposure to liability in this lawsuit. ALIA's argument that it provided the maximum coverage available to FREA members is immaterial; if ALIA was unable to provide the coverage requested by Allspect, it had a duty to advise accordingly. *See Rider,* 201 A.2d at 567 ("[I]f the broker agrees to obtain or try to obtain the coverage he knows or should know the principal seeks, and he finds that he cannot procure it, he is bound to notify his principal of that fact with reasonable dispatch."). ALIA's contention that it merely complied with the request contained in Allspect's application form is similarly inconsequential to the existence of a duty. *See Aden,* 776 A.2d at 803 ("A broker is not an 'order taker' who is responsible only for completing and accepting commissions."). Considering ALIA's specialized knowledge and Allspect's alleged reliance on this knowledge, a jury may reasonably find that ALIA breached a duty by failing to inform Allspect that it could not provide the coverage sought. *See Walker,* 523 A.2d at 668.

In addition to arguing that it fulfilled any duty owed to Allspect by placing the requested coverage, ALIA also argues that summary judgment is required because Allspect failed to allege the existence of a "special relationship" with ALIA. When considered in light of the evidence, ALIA's argument is unpersuasive. As ALIA correctly asserts, New Jersey courts have held that "a client must establish 'something more' than a broker-client relationship in order to impose a heightened standard of care on a broker." *Glezer-*

*man,* 944 F.2d at 151. However, these courts have also explained that the requisite special relationship is established by evidence of the client's reliance on the expertise of the broker. *See Sobotor,* 491 A.2d at 739 (stating that the duty of a broker to advise a client arises "when there is a special relationship between the insurance agent and the client which indicates reliance by the client on the agent"); *Avery v. Arthur E. Armitage Agency,* 242 N.J.Super. 293, 576 A.2d 907, 911 (1990) (explaining that "a broker's liability has turned on whether the broker's conduct invited reliance, or the client's conduct exhibited or justified a claim of reliance"), *both cases superceded by statute on other grounds as stated in Strube v. Travellers Indem. Co. of Ill.,* 277 N.J.Super. 236, 649 A.2d 624 (1994). A special relationship has also been established through evidence of "an inquiry or request by the insured or a specific representation by the agent or broker." *Wang v. Allstate Ins. Co.,* 125 N.J. 2, 592 A.2d 527, 536 (1991); *see also Avery,* 576 A.2d at 910 ("In every case but one since *Rider* was decided, the customer has initiated some contact with the broker concerning either the procurement or renewal of coverage."). Allspect's assertion that it informed ALIA of the type and breadth of insurance coverage desired, and that it relied on ALIA's expertise in its decision to purchase insurance, is sufficient to establish the existence of a special relationship invoking a heightened standard of care. *See Sobotor,* 491 A.2d at 742 ("By asking for the 'best available' insurance, respondent put [his broker] on notice that he was relying on the agent's expertise to obtain coverage."). ALIA has failed to demonstrate that no genuine issue of fact exists as to whether it breached a duty in failing to advise Allspect that the retroactive date of the BIC policy would not cover exposure to certain claims. ALIA's mo-

tion for summary judgment is therefore denied.

## CONCLUSION

For the foregoing reasons, ALIA's motion for summary judgment and Allspect's cross-motion for summary judgment against BIC are denied and BIC's motion for summary judgment is granted.

SO ORDERED.